Filed 8/24/22  P. v. Alardin CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JUAN MANUEL ALARDIN,<br><br>    Defendant and Appellant. | F082777<br><br>(Stanislaus Super. Ct. No. 205545)<br><br>**OPINION** |

## THE COURT[*]

APPEAL from an order of the Superior Court of Stanislaus County.  Carrie M. Stephens, Judge.

Robert Navarro, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman, and A. Kay Lauterbach, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

[*] Before Levy, Acting P. J., Poochigian, J. and Detjen, J.

## INTRODUCTION

On March 7, 1999, Robert Ybarra was standing outside a market in the small community of Grayson in Stanislaus County. A vehicle stopped near the market, a masked person got out of the front passenger door with a shotgun, and the gunman fired multiple shots into Ybarra's head and upper torso. Ybarra died at the scene.

Appellant Juan Manuel Alardin (appellant), and codefendants Felipe Solorio (Felipe) and Jeffrey Muniz, were charged with first degree murder. Felipe evaded arrest and was not apprehended. Muniz entered into a negotiated disposition and pleaded guilty to assault with a deadly weapon in exchange for his testimony against appellant. Miguel "Mike" Garcia was present during the murder and turned himself in to the sheriff's department shortly after the shooting; he was later released from custody and not charged with any offenses in exchange for his testimony against appellant.

In 2001, appellant was tried for murder. Based on testimony from Garcia, Muniz, and the victim's friends, the prosecution introduced evidence that appellant, Felipe, Muniz, and Garcia were in the car, Muniz supplied the shotgun, Felipe was driving, appellant was the gunman, and the motive was revenge because Ybarra had previously been in a fight with Felipe's brother. Appellant relied on an alibi defense based on the testimony of family and friends, who belatedly came forward at trial to claim he was elsewhere at the time of the shooting.

After a jury trial, appellant was convicted of first degree murder (Pen. Code, § 187, subd. (a));[1] the jury was unable to reach a finding on the allegations that appellant personally used a firearm (§ 12022.5) and was a principal when at least one principal intentionally and personally discharged a firearm, proximately causing bodily injury to a person other than an accomplice (§ 12022.7; § 12022.53, subds. (d) & (e)(1)). He was

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

sentenced to 25 years to life. In 2003, this court affirmed the judgment on direct appeal. (*People v. Alardin*, Apr. 9, 2003, F039369, pp. 2–3, 37 [nonpub. opn.].)

In 2021, appellant filed a petition for resentencing of his conviction for first degree murder pursuant to former section 1170.95, subsequently renumbered as section 1172.6, and asserted he was not the actual killer, he was convicted under the felony-murder rule and/or the natural and probable consequences doctrine, and he could not be now convicted of first or second degree murder because of the amendments to sections 188 and 189 enacted by Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437).[2] The superior court denied the petition and found he was the actual killer.

In this appeal, appellant argues the matter must be remanded because the superior court erroneously denied his petition without granting his request for appointment of counsel, requesting further briefing, or conducting a hearing, and it improperly made factual findings that he was the actual killer. Appellant argues the court's errors were prejudicial because he was tried and convicted of murder under both the felony-murder rule and the natural and probable consequences doctrine, and an order to show cause should be issued for an evidentiary hearing. (AOB 9-10; ARB 4-5)

We affirm the superior court's denial of appellant's petition and find the court's statutory errors were not prejudicial because, based on the instructions and verdict, appellant was convicted of first degree premeditated murder as a direct aider and abettor, and he is ineligible for resentencing as a matter of law.

---

[2] Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in the text. (Stats. 2022, ch. 58, § 10.)

# FACTS[3]

**The Fight**

Robert "Bobby" Ybarra (the victim) and his brother, Gilbert Ybarra, lived in Grayson, California.[4]

In approximately February 1999, Bobby walked to the Grayson Market with Tony Contreras and bought some beer. Bobby and Contreras were leaving the store when a car pulled up with two people inside. The occupants got out of the car and the driver said, " 'Westley' " and threw up a gang sign. Contreras testified that Bobby punched the driver and made him stagger back. Contreras testified the driver said, " 'We'll be back.' " The two people returned to the car and drove away. Contreras thought this incident occurred about three weeks before Bobby was murdered. Contreras testified he did not know either person in the car, but he later learned that Delfino Solorio was the person who Bobby punched.

Gilbert Ybarra testified that Bobby told him about the fight at Grayson Market the night it happened, which Gilbert thought was about two weeks before Bobby was

---

[3] While this appeal was pending, the People requested this court take judicial notice of our records and nonpublished opinion in appellant's direct appeal that affirmed his conviction and sentence. We granted appellant leave to file an informal response to the request, stated that failure to file a response may be deemed agreement that the request should be granted, and deferred ruling on the request until consideration of the appeal on the merits. Appellant did not file a response or opposition.

We grant this request and take judicial notice of this court's records and the nonpublished opinion in *People v. Alardin*, *supra*, F039369.

The following factual and procedural summaries are from the record and nonpublished opinion in his direct appeal, and the record in the instant appeal. As will be explained below, we provide the factual summary for background purposes but will not rely on these facts to resolve the issues presented in this appeal. (See § 1172.6, subd. (d)(3).)

[4] We refer to certain witnesses by their first names to avoid confusion.

murdered. Bobby said that he was in a fight with "Delfa" Solorio of Westley, and there was another guy at the fight named Mike or Miguel.[5]

Vidal Guerra was Bobby Ybarra's best friend and testified that Bobby told him several times about a fight he had at the Grayson Market with someone from Westley.

**The Two Drive-bys at Robert Ybarra's House**

On the afternoon of Sunday, March 7, 1999, Miguel "Mike" Garcia stopped by Jeff Muniz's (Jeff) house in Westley. Around 3:00 p.m. or 4:00 p.m., they walked to the trailer where appellant Juan "Johnny" Alardin lived with his grandmother. Appellant was there with Felipe.

Appellant and Felipe had been drinking and were already drunk. Jeff and Mike borrowed Felipe's red Pontiac four-door sedan and drove to a store to purchase a 20-pack of beer. They returned to the trailer and the four men drank together. The four men got into the red Pontiac, and Jeff drove them around Westley for 15 to 20 minutes. They returned to the trailer and continued drinking, and they also used methamphetamine.

Jeff testified that around 6:00 p.m., the four men got back into the red Pontiac and Felipe drove to a nearby schoolyard, where appellant's two daughters had been playing. Appellant had to take the children back to their mother's house in the nearby community of Grayson. The four men continued to drink beer during the drive to Grayson. Jeff testified that he had consumed six beers, but he could still walk, and he thought Felipe was more drunk than he was. Felipe was driving and appellant sat in the front passenger seat. Jeff and Mike were in the back seat, and appellant's children sat between them. Jeff sat behind Felipe and Mike sat behind appellant.

Jeff testified that when the group arrived in Grayson, Felipe drove to a residence he did not recognize but later learned belonged to the Ybarra family. Bobby Ybarra, Vidal Guerra, and Tommy Alvarado were standing on the side of the residence. Felipe

---

[5] Delfino Solorio is Felipe's brother.

slowed down and shouted through the open front passenger window:  " 'That's what I thought.' "

Jeff testified Felipe drove around the corner, made a U-turn, and returned to the Ybarra house.  Felipe shouted out the open window:  " 'You don't know who you're messing with.' "  Jeff testified he did not know what Felipe was shouting about, and figured Felipe was having problems with the people at that house.  The people standing outside the house did not respond to Felipe's shouts.

When Felipe drove the red Pontiac by Bobby Ybarra's house, Bobby was standing outside his house with his friends, Tommy Alvarado (Tommy) and Vidal Guerra (Vidal), and they were drinking beer and having a barbeque.  Tommy testified the red car partially parked into the driveway.  Someone in the car said, " 'What's up?' " in a mean tone.  Tommy interpreted the speaker's statement as trying to get them to "come out there or something."  Vidal heard someone shout something but could not tell what the person said.  However, Vidal thought they wanted to cause trouble.  Tommy noticed the red car's engine was clicking and not working well.  Tommy and Vidal testified the car stayed for about a minute and drove away, and they did not shout back to the occupants.

Tommy and Vidal testified the red car returned to Bobby's house within a few minutes, and again pulled into the driveway.  Once again, they noticed the distinctive noise from the car's engine.  Neither Tommy nor Vidal heard if anyone in the car shouted at them during the second drive-by.  Tommy thought there were three or four people in the car, with a driver and passenger in the front seat and a couple of heads in the back seat.  Tommy testified all the occupants were men.  He also noticed there was music playing in the car.  Vidal thought the whole car looked "filled" up, and there were at least four people inside.  Vidal was sure there were two people in front, and there were either two or three in the back seat.

Vidal testified he asked Tommy and Bobby if they knew who was in the car.  Bobby replied, " 'Hey, I think those are the fools from Westley.' "  Bobby told them not

to worry because nothing was going to happen. None of them confronted the people in the red car or shouted at them. Tommy testified that Bobby did not mention anything about a prior confrontation with the guys from Westley at that time.

Jeff Muniz testified that after they drove by Bobby's house the second time, Felipe drove to the residence of appellant's wife in Grayson, and they dropped off the children. Jeff sat on the hood of the car as appellant went inside the house with his children. Felipe went into the garage and messed with an old piano. An older lady emerged from the house and told Felipe not to touch the piano. Jeff and Mike were still drinking beer. Jeff testified they were at the house for five to 15 minutes. Someone said, " 'Let's go,' " and they all returned to the red Pontiac. Felipe was again driving, and appellant sat in the front passenger seat. Jeff and Mike were in the backseat.

Antonio Lomelli lived next to appellant's wife in Grayson. He noticed when appellant and his associates arrived because the car was very noisy. He also noticed when they started the car and left and thought the same people who arrived also left together, but he did not specifically notice if appellant was in the car.

Jeff Muniz testified that after they left appellant's wife's house, Felipe drove past Ybarra's house a third time. No one from the Pontiac shouted at Ybarra's house when they drove by for the third time. Felipe then drove back to Westley.

**The Gun**

Jeff Muniz testified that when they returned to Westley, they stopped at a store and Mike bought more beer. When Mike returned to the car, Felipe suddenly said that "he needed a gun. He said he wanted a gun. That's all he said." Jeff testified that he told Felipe he had a gun, but he did not ask Felipe why he wanted it. Jeff had loaned a weapon to Felipe on a previous occasion when they shot bottles and cans at the river.

Felipe drove them to Jeff's house in Westley. Felipe, Mike, and appellant waited outside while Jeff went into the house and retrieved a 12-gauge pump shotgun and four shells. The shotgun had a full-sized wooden stock, and the barrel was 18 and a half

inches long.  Jeff kept the gun under his bed.  Jeff testified that he realized Felipe had a problem with someone in Grayson but did not think about it as he returned to the car with the shotgun.  Jeff only had four shells, but he had given Felipe a box of .22-caliber shells when he previously loaned his rifle to him.  Some of the shells were in a leather pouch, and the others were in a plastic bag.

Jeff testified he returned to the car with the shotgun.  Jeff loaded the shells in the shotgun, racked it, removed the shells, and laid the gun between the front bench seats.  He placed the loose shells next to the gun.  No one said anything about the gun.  Jeff thought they would just cruise around for a while and drink the rest of the beer.

Jeff testified Felipe drove them back to the trailer where appellant lived with his grandmother.  Appellant told Felipe to stop because he had to get something.  Appellant went into the trailer and returned to the car within one minute.  Jeff did not see appellant holding anything when he got back into the car.

**The Murder**

After appellant returned from his trailer, Felipe drove them back to Grayson.  Jeff testified he listened to the radio and did not hear any conversation in the car over the noise of the engine.  Jeff's shotgun was in the middle of the front bench seat, pointing toward the dashboard.

Jeff testified that at some point that afternoon, he learned Bobby Ybarra had punched out Felipe's brother, Delfino Solorio, in a fight at the Grayson Market about two weeks earlier.  However, Jeff testified he still did not think anything was going to happen.

Tommy Alvarado and Vidal Guerra testified that after the red car drove around Bobby's house three times, they decided to arm themselves with rocks and sticks because they thought the car was going to return.  They eventually put down their weapons and decided the guys from Westley were not going to return.  They continued the barbeque and ate dinner at Bobby's house.  Tommy testified that at some point that night, Bobby mentioned that the guy in the car was someone he had recently punched.

8.

Bobby and his friends ran out of beer later in the evening. Tommy, Vidal and Bobby walked to the Grayson Market, which was just a few blocks away. When they reached the market, Tommy and Vidal saw the same red car with the noisy engine from earlier in the evening. Tommy testified that the car was near the market and pulled to the side of the road. Vidal testified the car drove toward them, but they kept walking toward the vehicle to see who was inside.

Tommy testified there were four people in the car. As soon as the car stopped, Tommy and Vidal saw a person get out of the front passenger side, holding a long, rifle-type gun. The gunman's face was covered with a black ski mask. Tommy and Vidal described the gunman as having a medium build and around five feet eight or nine inches tall. Tommy and Vidal immediately turned and ran from the store, and they heard at least four gun shots. They continued to run and split up. Tommy jumped over a fence and did not see what happened to Bobby.

Vidal stated he ran across the street and fell to the ground. He looked back toward the store and saw the red car leaving the area. Vidal ran back to the store and found Bobby lying on the ground and realized he had been shot. Tommy also ran back to the store after he heard the red car drive away. He found Vidal trying to help Bobby, who was wounded and unconscious.

Robert Rubalcava lived near Bobby's house and the Grayson Market, and heard four shots that evening. He ran to the street and saw a red car pass his house, and noticed the engine was knocking and making a lot of noise. Based on the engine noise, Rubalcava recognized the red car as a vehicle which had cruised his street earlier in the afternoon. Rubalcava then saw a small yellow car chasing the red car. He joined other neighbors who went to the market and found Bobby lying on the street. Rubalcava went back to his house and called 911.

In the meantime, Gilbert Ybarra, Bobby's brother, had been spending the evening with Santiago "Jimmy" Alvarado in Grayson. Jimmy drove Gilbert back to the Ybarra

house in his yellow Dodge Colt.  As Gilbert got out of the car, they saw a red car spin around the corner and speed past them.  Jimmy saw his nephew, Tommy Alvarado, running around the corner and trying to hide.

Gilbert testified they did not know anything about the shooting at the market when they saw the red car.  Jimmy thought the red car was chasing Tommy and unsuccessfully tried to block the vehicle with his own car.  Jimmy testified that Gilbert thought the guys were from Westley and they should let them go because they did not hurt Tommy, but Jimmy decided to follow the red car.  Gilbert testified that they decided to follow the red car because they were angry the vehicle drove recklessly through their neighborhood.  Gilbert testified they followed the red car for several blocks.  Gilbert described the red car as a "clunker" because the engine was noisy and cutting out.

Jimmy followed the red car to River Road.  The red car stalled and three people got out and pushed it into an orchard.  Jimmy testified the person who jumped from the passenger side was wearing a black shirt and a stocking cap on his head.  This person's left hand was straight down and not visible.  Jimmy testified the person who jumped out of the back passenger side turned and looked at him.

Jimmy testified they did not say anything to the people in the red car.  However, Gilbert testified that he got out of the yellow car and yelled, " 'Don't be going through our town like that.' "  Jimmy wanted to ask the occupants of the red car why they were chasing Tommy, but they immediately ran away.

Gilbert and Jimmy returned to their yellow car and drove to the Ybarra residence.  Tommy Alvarado arrived and told Gilbert that Bobby had been shot.  Gilbert ran to the store and found out Bobby was dead and went home to tell his family.

**The Investigation**

The Stanislaus County Sheriff's Department responded to Grayson Market at approximately 6:42 p.m.  The deputies found Bobby was dead, and lying in a pool of blood at the corner of the intersection.  Deputy Alberto Alvarez spoke to several

neighbors who were standing in the street, and they said three Hispanics in a maroon vehicle shot Bobby, and they were wearing dark clothing.

Bobby suffered multiple fatal wounds from shotgun pellets and/or bird shot to his right ear, brain, skull, and neck, and right upper arm, chest, and armpit. He was hit by at least three and possibly four shotgun blasts. At least two and maybe three shots were from shotgun slugs (a solid lead projectile), and there was one round of birdshot. The wounds to the right side of his body were inflicted with shotgun slugs and birdshot, did not penetrate very far into his body, and possibly ricocheted from the pavement. However, the head wounds were inflicted by a direct shotgun blast and were fatal. Bobby was five feet 11 inches tall and weighed 400 pounds, and most of the bird shot lodged in his body fat.

There were three expended 12-gauge Remington Peters shotgun shells and a piece of shotgun wadding near his body, and other pieces of wadding in his body. All the waddings were consistent with a 12-gauge shotgun. There was an area on the pavement where it appeared a slug hit the ground and split in two before it hit Bobby's right side.

Stanislaus County Sheriff's Sergeant William Heyne found the abandoned red Pontiac sedan in the orchard off River Road in Grayson. The officers escorted Vidal Guerra and Tommy Alvarado to the orchard, and they identified the red Pontiac as the vehicle that drove past Bobby's house earlier that evening, and from which the gunman emerged at the market.

Sergeant Heyne searched the Pontiac that night and found an expended 12-gauge Federal shotgun shell on the passenger floorboard. There was a half-full box of .22-caliber ammunition under the center of the front seat. A piece of paper with Felipe's name was on the driver's side floorboard. The driver's side windows were closed, but the front passenger window was rolled down. Mike Garcia's fingerprints were found on the outside window trim of the front passenger door. Jeff Muniz's fingerprints were

found on the outside of the car, between the rear view mirror and the driver's side back door.

There was a case of beer in the back seat which had contained 20 long-necked beer bottles:  13 full bottles were still in the case, and there were three empty bottles and four missing bottles.  The officers found two open bottles of beer in the orchard, that were one row away and six rows from the red car.

Sergeant Heyne found a "pass-through" from the Pontiac's back seat into the trunk.  He looked through the opening and saw a shotgun.  A .410-caliber shotgun was retrieved from the trunk.  Sergeant Heyne testified this weapon could not fire the 12-gauge shotgun shells found in the passenger compartment and near the victim's body.  The cartridge case was found in the orchard.  Jimmy Alvarado's yellow Dodge Colt was also searched and did not contain any weapons or items of evidentiary value.

Detective Alexander Callandrillo interviewed Tommy Alvarado, Vidal Guerra, Gilbert Ybarra, and Jimmy Alvarado on the night of the murder.  They were all intoxicated.  Gilbert Ybarra subsequently identified Miguel "Mike" Garcia from a photograph as one of the people who pushed the red Pontiac into the orchard that night.

On March 8, 1999, Stanislaus County Sheriff's Deputy Aaron Kiely was on patrol in Westley because the sheriff's department was worried about possible retaliation for Bobby's murder.  Deputy Kiely was approached by Esperanza Murillo, who said she had some information about the shooting.  Detective Callandrillo also interviewed Ms. Murillo, who was a distant cousin of appellant and lived across the street from his grandmother's trailer in Westley.  Ms. Murillo stated she had seen appellant that morning when he walked his daughter from school, and he was limping.  Ms. Murillo further stated she saw appellant the night of the murder, and he was drinking beer at the trailer with Jeff Muniz, Felipe Solorio and Mike Garcia.  Appellant's children were also there,

12.

and she saw the entire group leave around 6:00 p.m. Ms. Murillo also stated she had seen appellant at the same location on prior occasions with firearms.[6]

**Mike Garcia's Statement**

On March 9, 1999, Mike Garcia turned himself in to the sheriff's department and gave an interview to Deputy Martinez. Mike stated that after the shooting, they all split up and he ran through the orchard to Jeff Muniz's house. Mike found Jeff was already home with his wife and children. Mike said appellant arrived at Jeff's house about 20 minutes later. Mike said appellant was wearing slip-on type shoes, asked for a beer, and acted like nothing had happened. Mike told appellant that he had messed up, but appellant did not respond. Mike did not say anything about appellant and Jeff having a private conversation in the backyard.[7]

**Jeff Muniz's Statement**

Also on March 9, 1999, Jeff Muniz voluntarily went to the sheriff's department. Detective Callandrillo advised Jeff of the *Miranda*[8] warnings, but Jeff did not request a lawyer and agreed to answer questions about the shooting.[9]

Jeff stated he heard something about Felipe shooting a person in a field but did not know much about the incident. Detective Callandrillo replied that Mike Garcia had already told them the whole story, and other witnesses placed Jeff in the backseat of the car when the shooting occurred. Jeff claimed he borrowed Felipe's car earlier that day and went to the store with Mike, and there was no way he was in the car during the shooting. Jeff repeatedly insisted he was not there and was willing to take a polygraph.

_____

[6] At trial, Ms. Murillo denied making these statements. She testified that she heard many years ago there might have been a gun at appellant's residence but claimed she had never seen appellant with a weapon. She also denied that appellant's family pressured her to retract the statement about the gun.

[7] The evidence about Mike's pretrial statement was introduced by the defense.

[8] *Miranda v. Arizona* (1966) 384 U.S. 436.

[9] The videotape and transcript of Jeff's interview with the sheriff's department was introduced by the defense.

Callandrillo repeatedly advised Jeff to tell the truth because too many people said he was in the car.

Jeff eventually admitted he saw the shooting, but he just thought there was going to be a fight because of a prior dispute. Jeff was there because they were dropping off the children. He was scared and did not want anything to happen to his family because "they could come and do something to me at my house."

Jeff further stated Felipe and appellant talked between themselves about an earlier dispute, but he did not hear the entire discussion. Felipe was driving the car and appellant was in the front passenger seat, and Jeff and Mike were in the back seat. Felipe said he had a "beef" with the guy who was later shot, based on a fight between that guy and Felipe or Felipe's brother. Felipe drove the car around the guy's house twice, and they stared at each other. Felipe also yelled something, but Jeff could not hear the words.

Jeff said that later that day, Felipe drove by the market and stopped the car. Appellant got out and Jeff thought they were going to fight. Jeff heard the gunshots and appellant returned to the car. Felipe drove off, but the engine died, and they pushed the car into a field. Jeff got out and ran home because he was scared.

Detective Callandrillo asked Jeff where they got the gun, and Jeff said he did not know. Callandrillo replied that Mike said they got the gun from Jeff's house. Jeff admitted that after they drove around Bobby's house, someone said he needed a shotgun, and Jeff got the gun and ammunition from his house. He loaded the pump shotgun with four shells, but he did not think anyone was going to get shot, and thought they were just going to drive around the house again.

Jeff said he put the gun in the middle of the front seat. Appellant grabbed the shotgun and told Felipe to stop the car. Jeff said three people were walking on the street when appellant said to stop the car. Jeff thought appellant was just going to scare the three guys and did not think he was going to shoot anyone. Jeff agreed with Detective Callandrillo that the shooting was kind of bizarre. Jeff repeatedly said he did not shoot

14.

Bobby, but he knew the victim was dead when he heard the shots. Appellant had the gun when the car stalled in the field, and Jeff did not know where it was now. Jeff did not know that another gun was in the trunk.

At the end of the interview, Detective Callandrillo showed Jeff several photographs, and he identified Mike Garcia, Felipe Solorio, and appellant. Callandrillo advised Jeff that his mother had called and claimed appellant had left a telephone number for Jeff to call him back. Callandrillo asked Jeff if he would call his mother and give him that telephone number, and Jeff agreed.[10]

**Appellant's Arrest and Felipe's Escape**

Detective Callandrillo testified that extensive efforts were made to apprehend Felipe and appellant. Bobby's murder was covered in several newspapers, and on television and radio stations. Bobby's family distributed 500 to 1,000 posters in Grayson, Westley and Patterson, which contained the suspects' photographs and asked for information about them. In June 1999, the Carrington Foundation offered rewards of $5,000 and $10,000 for the suspects.

On July 15, 1999, Detective Ed Campbell and Deputy Saldivar received a tip from appellant's father-in-law that appellant might be staying near some trailers in Westley. Appellant's father-in-law gave the tip to officers because he was interested in collecting the reward and also concerned for his grandchildren's safety. The officers went to several trailers and eventually contacted appellant's grandmother, who said appellant was not there but allowed them to look inside the trailer.

As they walked through the hallway, Deputy Saldivar encountered appellant who was standing behind a door. Saldivar pulled his gun and ordered appellant to raise his hands. Appellant complied and was arrested for murder. Appellant had changed the color of his hair and eyebrows and shaved his mustache.

---

[10] At trial, Detective Callandrillo testified Jeff gave him the telephone number as requested, but it was for a business which had never heard of appellant.

As noted above, appellant Alardin and codefendants Felipe Solorio and Jeff Muniz were charged with first degree murder of Bobby Ybarra. The entire Solorio family left Grayson within weeks of the murder. The sheriff's department tracked down members of Felipe's family in Nevada and other communities but could not find Felipe. The officers later received information that Felipe was in Mexico.

At the time of appellant's trial, Felipe had not been apprehended, the Solorio family was no longer in California, and there was still an active warrant for his arrest for murder.

Also as noted above, Jeff Muniz entered into a plea agreement for assault with a firearm and agreed to testify against appellant. Mike Garcia was initially named as a codefendant in the criminal complaint for murder. In June 2000, shortly before the preliminary hearing, Mike agreed to testify against appellant, and he was released from custody and not charged with any offenses in this case.

**Jeff Muniz's Testimony About the Murder**

At trial, Jeff Muniz testified as a prosecution witness and gave the following account of the shooting. After Jeff picked up his gun and appellant stopped at his trailer, Felipe drove the group from Westley to Grayson. Appellant told Felipe to pull over when they reached the Grayson Market, and Felipe stopped the car near the market. Jeff testified he got out of the car and drank another beer. Appellant also got out of the car and walked away. Jeff testified he did not see the gun in appellant's hands, and just thought he was going to fight someone.

Jeff testified that he heard shots and dropped his beer can. As Jeff bent down to pick up the can, appellant returned to the car and got back into the front passenger seat. The others jumped back into the red Pontiac and Felipe drove them from the area. Jeff testified that he was scared, but no one said anything as they drove away. Mike was still in the back seat, and they just looked at each other. Jeff testified that he did not notice if appellant was holding the shotgun when he got back into the car.

16.

Jeff testified that Felipe drove away as fast as possible, but they had mechanical problems with the Pontiac's accelerator. The engine cut out, and the vehicle rolled into an orchard, and they got out of the car. Jeff looked down the road and saw a yellow car driving toward them. Jeff realized the yellow car had followed them, and he started to run from the orchard toward Westley. Appellant, Mike, and Felipe were in front of him, but it was dark, and he lost sight of them as they ran away. Jeff took the pouch with the cartridges with him when he ran from the car, and he threw it in the orchard during his escape.

Jeff testified that he ran and walked back to his home in Westley, about two miles away, and did not see anyone else. He ate dinner and went to bed; he did not tell his wife anything about the incident. He had been in bed for about 30 minutes when his wife woke him up and said Mike Garcia was there and wanted to see him. Mike asked Jeff if he could get a ride back to his home in Modesto, and they called Mike's wife and another friend. Jeff testified that he did not talk to Mike about the shooting because he was too scared, and he did not want his wife to hear anything.

As they waited for Mike's ride, appellant arrived at Jeff's house wearing slippers and sweats. Jeff testified appellant's clothing was completely different from earlier in the evening. Appellant asked for a beer, but Jeff replied he did not have any more. Appellant looked at Jeff and said they had to talk.

Jeff testified that he went outside with appellant, but Mike stayed in the house. Jeff testified that appellant told him "not to worry about it. 'If anybody comes to talk to you, don't worry about it. You didn't have nothing to do with it. Just keep it like that.' " Jeff never asked what happened to his shotgun. Jeff testified that Mike came outside and did not participate in this conversation, but he could have overheard appellant as he talked with Jeff. They heard a car horn and realized Mike's wife had arrived, and Mike left with her. Appellant left separately, and Jeff went back to bed.

17.

Jeff testified that he did not know that the person who was shot by appellant had died, but he was "pretty sure" someone was dead. Jeff went to work the next morning at 5:00 a.m., and later turned himself in to the sheriff's department.

**Mike Garcia's Testimony**

Mike Garcia also testified as a prosecution witness and confirmed most of Jeff Muniz's testimony about their activities that night. They drank beer with appellant and Felipe at the grandmother's trailer in Westley. They left Westley to take appellant's children back to their mother in Grayson. Felipe drove the Pontiac and appellant was in the front passenger seat, while Mike and Jeff sat in the back seat with the children.

Mike testified that appellant took the children into the house and returned to the car. "Then Felipe had said that he had problems with Bobby and his brother." Felipe said his brother, Delfino Solorio, had been in a fight with Bobby about two weeks ago, and Felipe "wanted to be involved."

Mike testified that Felipe drove them to Bobby's house in Grayson, and Bobby was outside with three other people. Mike testified that Felipe spoke to Bobby and said, " 'Come on. Come on,' " but Bobby did not seem to hear them. Mike testified that there was anger in Felipe's voice as he called out to Bobby. Neither Bobby nor his friends replied. Felipe drove away, turned around, returned to Bobby's house, and again started to talk to Bobby. Felipe again said, " 'Come on. Come on,' " but it again appeared that Bobby could not hear him. Mike testified they drove past Bobby's house a third time, then returned to Westley.

Mike asked Felipe to stop at the store in Westley because he wanted to buy more beer. Mike returned to the car with the beer, and Felipe said that he needed a gun. "And then Jeff said that he had one, and then [appellant] said he had one. Then Jeff said that— to go get his, so we went to Jeff's house."

Mike testified that Felipe drove them to Jeff Muniz's house. Jeff emerged within two minutes with a gun and a small box. Jeff handed the gun and the box to Felipe.

18.

Mike did not ask Felipe why he wanted the gun because he was too scared. Felipe put the gun in the front passenger side of the car, where appellant was sitting. Appellant told Felipe to drive to his house, and they returned to the trailer where appellant lived with his grandmother. Appellant was in the trailer for about two minutes and returned with something big in his pocket.

Mike testified that he was scared something was going to happen, and he asked Felipe, " 'Why are you going to do this?' " Mike was not sure if Felipe responded to him. Mike testified that he wanted to get out of the car, but he was too scared to move, and he was afraid the others would do something to him if he tried to leave. He was also afraid because Felipe had a gun, he had been drinking, and he was in a bad mood. Felipe drove to Grayson, and appellant was again in the front passenger seat. Felipe and appellant talked during the trip, but Mike could not hear them over the sound of the noisy engine.

Mike testified that as they arrived in Grayson, appellant racked the shotgun, and Felipe told appellant "to shoot him in the legs." They reached the Grayson Market and Mike saw Bobby walking down the street. Appellant pulled a beanie hat out of his pocket, and Mike told him not to do it. Appellant told him to shut up. Appellant was wearing a black shirt and black pants. Felipe drove close to Bobby, and appellant got out of the car and shot Bobby. Mike testified that Bobby went down with the first shot. There were two other people with Bobby, but they immediately ran away. Mike heard four shots fired in a row.

Mike testified that appellant jumped into the car, and they took off. However, the car stalled, and it rolled into an orchard. Appellant got out and ran away with the shotgun and headed toward Westley. Mike testified that he clearly saw appellant carrying the shotgun as he ran from the car. Mike looked behind them and saw a small yellow car chasing them. Mike, Jeff, and Felipe pushed their car further into the orchard, then Mike

19.

ran back toward Westley. Mike did not know what happened to Jeff and Felipe because they were behind him, and he just kept running.

When Mike reached Westley, he went to the schoolyard and waited for Jeff, but he never came. Mike decided to walk to Jeff's house and found him there. Jeff's wife told Mike that his girlfriend was looking for him. Jeff's wife left the room, and Mike told Jeff he was scared, and appellant messed things up. Jeff said he was also scared. Mike called his girlfriend and asked for a ride home, but she refused. Mike called a friend who agreed to give him a ride. However, his girlfriend called back and agreed to pick him up, and Mike called his friend and cancelled the ride.

Mike testified that appellant also arrived at Jeff's house. Appellant was wearing slippers and a white shirt and asked for a beer. Appellant told Jeff and Mike he was scared, but Mike did not say anything to appellant. Jeff and appellant went into the backyard and Mike stayed inside. Mike eventually went outside and found Jeff and appellant talking quietly. Mike could not remember what they were talking about, and he did not join the conversation. His girlfriend arrived and he left with her.

Mike told his girlfriend that night about appellant's conduct. The next day, Mike turned himself in to the sheriff's department. Mike reached an agreement with the prosecutor's office to testify at the preliminary hearing and trial, and he was released from custody and not charged in the case.

Patricia Garcia testified that Mike called her on March 7, 1999, and asked for a ride home from Jeff's house. She drove to Westley and picked him up, and Mike was quiet during the drive back to Modesto. Patricia testified that when they arrived home, Mike told her that appellant shot someone that night. Mike said appellant got out of the car and shot someone, and the shooting was about a previous argument with that person. Mike said that he was really scared the entire time, and everyone ran away when their car stopped. Patricia told Mike that he had to turn himself in. They read a newspaper article about the murder the next day, and Mike turned himself in to the sheriff's department.

20.

**Appellant's Jail Communications with Jeff Muniz**

Appellant and Jeff Muniz were held at the Stanislaus County Jail after they were arrested in this case. Jeff testified that he did not see appellant until four or five months after the shooting, when Jeff was in the visiting room with his wife. Appellant told Jeff he was going to try and help Jeff because he had nothing to do with the shooting.

Jeff testified he later spoke with appellant when they were two cells apart in the same tier (X tier) and shared the same exercise yard. Jeff believed these conversations occurred in 1999 or 2000. Appellant asked Jeff what he told the police, and Jeff replied that he did not say very much.

After that conversation, appellant gave Jeff a transcript of his (Jeff's) earlier statement to Detective Callandrillo. Appellant asked Jeff why he lied to him about what he told the police. Appellant told Jeff to read the transcript, asked him to explain what he meant, and told Jeff he needed to change some of the stuff he told the police. Appellant specifically told Jeff to change what he had said "about when [appellant] was in the car, when he got dropped off and he stayed home when we left." Appellant told Jeff to help him out.

Jeff testified that he told appellant he would try to change his statement and say appellant was not in the car when the shooting occurred. Jeff made this statement to appellant because he did not want to get stabbed in prison. This conversation occurred before the preliminary hearing in this case (which was held in June 2000), but Jeff did not testify at that hearing.

Jeff identified exhibit No. 25 as the document which appellant gave him in jail. It consisted of the transcript of Jeff's interview with Detective Callandrillo on March 9, 1999, as discussed above. Jeff testified that appellant marked numerous passages in the transcript with lines and stars. Some of the passages were marked with one star, while other sentences were marked with four stars. Jeff asked appellant about the marked passages, and appellant said he did not like Jeff's answers in those sections.

21.

Appellant had put four stars on passages where Jeff made the following statements: Jeff placed the shotgun in the car next to appellant and Felipe, appellant told Felipe to stop in front of the store when they saw three people walking on the street, Jeff did not think appellant was going to shoot anybody, the shooting was bizarre, Jeff identified appellant from a photograph, and Jeff agreed to call his mother to get appellant's telephone number. At the end of the transcript, the following words were handwritten: " 'What you go [*sic*] to say about all this now?' "

During a subsequent conversation in jail, appellant told Jeff: " 'When you go to the pen [*sic*], all this is going to be there and you're going to get dealt with.' " Jeff testified that appellant never personally threatened him, but he said Jeff would get hurt "later on down the line." Jeff was not afraid of appellant, but he was afraid of other inmates "[b]ecause, to them, I am no good" since he testified against appellant. Jeff testified that he started to receive threats from other inmates after appellant gave him the annotated transcript of his interview with Detective Callandrillo. Based on these threats, Jeff asked prison authorities to move him to a different tier and place him in protective custody. Jeff testified that about six months after he was placed in jail, he realized the other inmates considered him to be a snitch.

**Testimony About the "Kite"**

Jeff Muniz testified that he received a "kite" from appellant while he was in jail. Jeff described a "kite" as a slang term for very small writing on paper passed in the jail. Jeff believed he received the kite a few weeks after appellant gave him the transcript of his interview with Detective Callandrillo. Jeff testified that the "kite" instructed him to change his statement because everything he said would follow him to prison, and "just change it so nothing will happen to me." Jeff testified that he received a couple of kites from appellant. Jeff also sent appellant a kite in which he explained how he was going to testify.

22.

On August 8, 1999, Deputy Raymond Hegwood searched a cell in the X tier at the Stanislaus County Jail as inmate Julio Zaragoza was changing cells. Deputy Hegwood searched a paper bag or some kind of file folder, and found a small, rolled-up paper which was tightly wrapped in a piece of knotted plastic. A message was written on the paper, and he seized the item and gave it to Deputy Jeremy Fielder. Deputy Fielder described this item as a "kite." Deputy Fielder typed a transcription of the kite and gave the information to the district attorney's office. It took him a while to read the note because the writing was so small, but he did not need a magnifying glass to read it.

At trial, both the original kite and Deputy Fielder's transcription were introduced into evidence. Deputy Fielder read the transcription to the jury:

> "Jeff [checkmark] yeah. We need to communicate if we are to get out of these bullshit charges. I need you to pay close attention to what I'm putting down. I got the police report. You say you don't. All right, then I'm going to tell you what it said. You were read your rights and then asked if you wanted to talk to—talk. You said yes.

> "At first you denied everything and said you were home and your wife could verify your story. Then they told you what Mike said and you began to cry. After that you said you were there at the time of the shooting and that the shotgun used was yours but you didn't shoot. You said Johnnie shot and killed Robert. You insisted that you thought Johnnie would just scare him. That's basically it.

> "What's up now? Are you going to deny this? You f[**]ked up. You thought by putting the shit on me you would get to go home like Mike. You know I'm right. Now you know that by saying you supplied the gun your ass is going to do some time.

> "But because you've never been in jail I'm going to give you a break. You can still get out of this if you listen to what I'm saying. I would like [your children] to have their dad back. Even though you're f[**]king me with your lies, I want to go home too. [My children] need their dad so [checkmark] it.

> "First step tell your lawyer you want to recant your statement. You said what you said because you were scared. You thought that if you said what they wanted to hear, they would let you go home. You know it was

23.

wrong and now you want to say the truth. If your lawyer doesn't want to go along, you fire his ass and get another.... [¶] … [¶] Your lawyer wasn't present at the time of questioning and he let you f[**]k yourself. [¶] … [¶] You need to fire him anyway. I would.

"You know I got more to tell you, but this is all for now. Get back at me on a kite like this. When I come down from the yard, pass me back this kite and when we shake hands, wrap it up in plastic from the garbage bag. This is how we will communicate. Do not show anybody this or talk about it.

"If you don't return this back to me, then shit will hit a whole new different level. Understand when I first read the police report what you said pissed me off. But if you make it right, we can be friends through this and believe it or not we'll beat this shit. I'll give you more info later. Get back at me, let me know what's up, what you think what you're … going to do. Later, J."

Detective Fielder testified that the following words were written on the back of the kite: "Give this back to me!"

**Further Prosecution Evidence**

At trial, Tommy Alvarado testified the person who shot Bobby was about five feet eight or nine inches tall, medium build or a little bigger, and well-built. He could not tell any difference between appellant's build and the shooter's body. Vidal Guerra described the shooter as about 170 to 180 pounds, with a pretty good build. Vidal testified that appellant also had a pretty good build and was the same size and height as the shooter.

Also at trial, Jeff Muniz testified that during one of his conversations with appellant in jail, appellant said he hid the shotgun under some insulation in an attic but did not clarify whose house it was in. Jeff admitted he told the police about this conversation about a week before trial.

Defense counsel attempted to impeach Jeff Muniz's testimony. Jeff admitted he had been arrested for the murder of Bobby. Defense counsel asked whether he read the police reports about the case after he entered into his plea agreement with the district attorney. Jeff testified that he read some police reports, his attorney gave him a copy of

24.

Mike Garcia's statement to the police, and appellant gave him the copies of his own statement to Detective Callandrillo. Jeff admitted he did not tell the truth when he initially spoke with Callandrillo and the other officers. Jeff also admitted he knew he could lose the plea bargain if he did not tell the truth at appellant's trial, and he knew what Callandrillo believed the truth to be.

Defense counsel further impeached Jeff with the following inconsistent statements he previously made to the police: that they dropped off appellant and the girls before the shooting, where he got the shells for his pump action shotgun, and whether he loaded and unloaded the shotgun.

Also on cross-examination, defense counsel tried to establish that Jeff was already considered a snitch, even before he entered into the plea bargain, because of the statements he made during his initial interview with Detective Callandrillo. Defense counsel tried to establish that Jeff entered into the plea bargain and testified against appellant simply to be placed in protective custody because he was facing threats based on his statements to Callandrillo.

## DEFENSE ALIBI EVIDENCE

Appellant did not testify at trial but called several witnesses who presented an alibi for him at the time of the murder.

Gloria J. (Ms. J.), appellant's mother-in-law, testified that appellant and her daughter were separated at the time of the murder. Appellant had visitation with his children on the weekend. On the afternoon of March 7, 1999, Ms. J. was standing outside her house in Grayson with Bob Henline, her neighbor, when appellant arrived to drop off the children. Ms. J. believed appellant arrived between 4:00 p.m. and 5:00 p.m., when it was still daylight, and he was in a red car with a noisy engine. Ms. J. thought appellant was in the back seat with the children, and there were other people in the car. Ms. J. testified that appellant stumbled out of the car and fell to the ground, which was the result of an ankle injury and a recent operation. Ms. J. testified that appellant also fell

25.

because he was drunk and smelled of beer, which was unusual for him. However, she conceded she was not sure where appellant had been sitting in the car because they all got out at once. "It seemed to me like they were all in the back seat. I don't know if [appellant] fell out of the front seat, back seat or where. He just kind of fell out. I wasn't really paying attention, and I didn't have my glasses on that day." She thought appellant got out of the rear passenger door. Appellant asked her to babysit the children because he wanted to continue partying with the guys, and he did not want to drink in front of the kids. Ms. J. was upset because the children were dirty and told appellant to take them inside and give them a bath.

Ms. J. testified that appellant told his friends in the car that he could not go with them. Felipe became mad and banged on a piano which Ms. J. and Mr. Henline had been moving in the garage. She told him not to bang on the piano. Ms. J. testified that appellant was mad at Felipe because he did not drive straight to the house to drop off the children. "[Appellant] said that [Felipe] was swearing and, you know, he was swearing, yelling and stuff, and he got real mad because [appellant] would never – he never disrespects his girls." Appellant was angry because Felipe drove them to Bobby's house, and Felipe yelled and swore in front of the children.

Ms. J. testified that appellant went into the house with the children and was inside for about one hour as he bathed the children, dressed them for bed, and read them a story. Appellant's friends stayed outside and tried to convince her to let appellant leave. She refused, and they returned to the car and quickly drove away. Ms. J. only knew Felipe and had never seen the other men. Ms. J. remained outside with Mr. Henline. She thought appellant finished with the girls around 6:00 p.m.

Ms. J. testified that appellant stayed at her home the rest of the night. The Grayson Market was about three blocks away from her house. Ms. J. heard shots fired that night and learned within a short time that Bobby had been murdered from either her son, Arthur, or her friend, Marty Espinoza. The day after the shooting, a deputy came to

26.

Ms. J.'s house and looked for appellant. She tried to tell the deputy that she could account for appellant's whereabouts at the time of the shooting, but the deputy did not write anything down. Ms. J.'s friend, Marty Espinoza, also tried to tell the deputy she saw appellant that night, but the deputy looked past them and left. Marty wrote down the deputy's name and badge number and wanted to file a complaint. Marty later moved away, and Ms. J. did not know if Marty ever filed the complaint. Ms. J. realized the officers were looking for appellant because of the murder.

Ms. J. was not scared when she learned appellant was wanted for murder because she knew he had been with her that night and did not do it. Ms. J. admitted that she and her husband made arrangements for the sheriff's department to find and arrest appellant. Her daughter later divorced appellant.

Ms. J. admitted she visited appellant in jail in July 1999. She gave a statement to defense investigator Alan Peacock on September 24, 1999, but she had previously given a statement to a sheriff's captain, who contacted her the night of the murder and asked if appellant was there. She told the captain that appellant spent the night with her, and she would have other witnesses contact him and confirm her account. However, she never had her friends follow up on these statements. Ms. J. asked Marty Espinoza and Mr. Henline to write down statements about their observations of appellant that night, and she gave the statements to her daughter. Ms. J. testified she never contacted the media or any other law enforcements officers to tell them that appellant was not involved in the murder "because I was told that my testimony didn't matter, because I was the mother-in-law."

Ms. J. further testified that Thomas M., her son's friend, had seen the red car screech away from her house and noticed appellant was not inside. She tried to get a statement from him, but he refused because his friends would get angry and probably beat him up.

27.

Ms. J. testified that appellant was a very gentle, loving, and kind man, who could not hurt anyone. Ms. J. denied that she would lie to protect appellant, and insisted she was not making up a story to help him. Ms. J. admitted her memory was not that good, and she had three strokes in the 18 months before the trial.

Robert Henline confirmed that he was helping Ms. J. move a refrigerator and piano when appellant arrived with his friends and his children. Henline had never met appellant, and Ms. J. identified him as her son-in-law. Henline left Ms. J.'s house about five to 10 minutes after appellant arrived, and appellant was still there when he left. Henline rode his bicycle to his own house, about two blocks away. A few minutes later, he thought he heard a car backfire and realized gunshots had been fired, and later heard police sirens. Ms. J. later asked Henline to write a statement about seeing appellant, and he complied and left the statement with her. At the time of trial, Henline was in prison after being convicted in 1999 of manufacturing methamphetamine, and he was never held in custody with appellant. Henline testified that he was not lying for appellant and did not know him well enough to do so.

Mary "Marty" Espinoza testified that she drove appellant's children to Westley around noon on March 7 and left the children at the trailer with appellant's grandmother. She did not see appellant at that time. Marty testified that she drove to Grayson to visit her friend, Ms. J., later that evening. Marty arrived in Grayson between 6:30 p.m. and 7:00 p.m., and she saw several police officers in an orchard. She drove to Ms. J.'s house and sent her son to the door to see if Ms. J. was there. Appellant answered the door and said Ms. J. was probably across the street. Marty testified that appellant's children also came to the door, and they were all wet and had just been bathed. Appellant was limping from a foot injury.

Marty testified that she was also at Ms. J.'s house several days later when deputies searched the residence for appellant. She and Ms. J. tried to tell the deputies that appellant was at the house at the time of the shooting, but the deputies were rude and said

28.

they had all the information they needed. Marty wrote down one deputy's name but had misplaced it. About one week later, Marty wrote a statement that she had seen appellant at Ms. J.'s house with the children. She gave the statement to Ms. J. In September 1999, Marty spoke with the defense investigator, Mr. Peacock, who had a copy of her statement and asked her questions about it. Marty testified that she had no reason to lie for appellant.[11]

Arthur J., Ms. J.'s son and appellant's brother-in-law, lived in Grayson with his mother. Arthur testified he was visiting his friend, Carlos, when he heard shots fired in the neighborhood. Carlos's house was about two houses away from Arthur's house. Arthur heard a noisy red car drive through the neighborhood at a high rate of speed.

Arthur testified that he went home and told his mother about the shots, and said he was going to see what happened. Arthur testified that appellant was at his mother's house and sitting on the couch. Appellant was wearing shorts. Arthur testified that he playfully slapped appellant's head and knew appellant would not chase him to retaliate because he had a "gimpy leg," and he was drunk.

Arthur rejoined Carlos and they drove around the neighborhood to see what happened. They went to the market and saw Bobby's body in the street. The police had already arrived. They continued to drive around and saw the abandoned red car in the orchard. Arthur testified that he recognized the red car as the noisy vehicle he saw and heard earlier that day. The police told them to leave the area. Carlos drove back to his house, and Arthur walked home.

Arthur testified that he returned to his house within 10 to 20 minutes from when he initially saw appellant with his mother. When he returned, appellant was still at the

---

[11] Detective Callandrillo testified that he looked through the files at the sheriff's department and did not find any written statements about appellant's alleged alibi. If such statements had been in the file, he would have conducted a follow-up investigation and interviewed the witnesses, but there were no follow-up interviews in this case.

house, and the children were asleep. Arthur told appellant and his mother that Bobby had been killed. Appellant wrestled with Arthur and was "kicking my butt" because Arthur had hit him earlier.

Arthur testified that he left Ms. J.'s house with appellant, and they went across the street to another relative's house. Arthur's father was there, and they talked about the shooting. They stayed there for about 10 minutes then returned to Ms. J.'s house and saw Arthur's friend, George. Arthur and George wrestled on the floor, then they left later that evening. Arthur returned home around 11:00 p.m. and he did not see appellant.

Arthur testified that appellant was "[s]tumbling" drunk that day. Arthur could smell alcohol on appellant's breath, his speech was slightly slurred, and he was "acting stupid and stuff like that."

Arthur testified that he did not want to be at the trial because he had to miss school, but he would not lie for appellant "in this serious a matter," and he was not making up an alibi for him. Arthur testified that he spoke to a "fat white cop" from the sheriff's department, who was looking for appellant the day after the murder. Arthur told the officer that he went home within five to 10 minutes after the shooting, and appellant was there with Ms. J. Arthur testified that the officer wrote down the information. Arthur also spoke several times to the defense investigator, Alan Peacock, and told him about appellant's alibi.

Arthur testified that he moved to Las Vegas with his mother and appellant's children shortly after Bobby was murdered. Appellant contacted his children by telephone while they were in Las Vegas. They lived there for a few months then returned to Grayson. Arthur did not know appellant's whereabouts, but he knew appellant was on the run. Arthur's father turned in appellant in July 1999.

George I., Arthur J.'s friend, testified that he heard sirens on the day of the shooting and walked to the market. The police had already taped off the area, but he found out Bobby had been shot. Around 9:00 p.m., he walked to Arthur's house. George

30.

testified that Arthur was there, but he did not see appellant. George told Arthur that Bobby had been shot. George testified that Arthur was shocked and wanted to check it out. However, Ms. J. saw the police around the area and did not want them to be involved, so they stayed at Ms. J.'s house and watched television. George testified that appellant later walked in the front door. He was wearing a white T-shirt and blue jeans. Appellant acted normally and did not seem drunk. George, Arthur, and appellant played around and wrestled for about 10 to 15 minutes. George testified that he did not see appellant after they wrestled, but he never saw appellant leave the house. George spent the night at Arthur's house, and learned the next day that appellant was wanted for the shooting.

George testified that he had not received any pressure from people in Grayson to not testify. George also testified that he had been totally cooperative with the defense investigator, but he really did not see anything.

Alan Peacock, the defense investigator, testified that he spoke with George in February 2001. George was with a man who told George not to talk, and who told Peacock not to interfere in Grayson business. George said he was reluctant to give a statement because " 'I still live in Grayson.' " Peacock explained it was important to the people in Grayson for him to tell the truth. George then said he met Arthur at some place between the market and Arthur's home. They went inside the house together and appellant was there. George and Arthur wrestled with appellant. Ms. J. was not there when George arrived. George stated he went home around 9:00 p.m. because it was a school night. Peacock acknowledged that George's statement was different from his trial testimony.

Peacock further testified that in August or September 1999, he saw defense counsel hand over copies of the statements from Marty and Henline to Deputy District Attorney Doug Maner. The exchange occurred in a hallway outside the courtroom, and defense counsel gave Maner his only copies of the statements. Peacock waited for about

31.

one month until he tried to contact these witnesses because he did not want to taint their statements before they spoke to the prosecutor's investigator. Peacock did not have any copies of these written statements, and defense counsel thought Gloria Alardin (appellant's ex-wife) had the original statements. Peacock repeatedly asked Gloria Alardin to find and turn over the statements, but she never did so. Peacock finally interviewed Gloria and Marty in September 1999, and they said they tried to give their information to a deputy, but failed to describe him as a "fat white cop." His attempts to interview Henline were delayed by Henline's incarceration, and he finally spoke with him in April 2000.

**Gloria Alardin's Testimony**

Gloria Alardin (Ms. Alardin) had two daughters with appellant. She separated from appellant because of his drinking and filed for divorce in April 1998. At the time of the murder, she lived with her mother and children in Grayson, and appellant lived with his grandmother in Westley. Ms. Alardin dropped the children off at their school in Westley and appellant picked them up. Appellant had the children on Sundays, and they would stay overnight, and he would take them to school the next morning. Appellant occasionally stayed at her house when he brought the children back late and fell asleep. Ms. Alardin testified that she would not lie for appellant.

Ms. Alardin testified that she was present when Mike Garcia went into Grayson Market to buy a beer. Bobby took the beer from Mike and picked a fight with him. Mike was quite upset, and he wanted "to go start trouble." "And I'm married to someone from Westley, or was, and I live in Grayson, so I was the first one to pipe up and say, 'I don't think so. You need to be quiet and sit down.' [¶] And he bounced around a little bit and was upset about it, but it just—I kind of defused the thing and said, 'You're not going to do it, so don't even bother.' " She did not have any problems with Bobby. Ms. Alardin testified that she told her friends about this incident, but never told any officers about the

dispute and never mentioned it until the instant trial. She simply assumed everyone knew about it.

On the day of the murder, Ms. Alardin was working as a real estate agent in Ceres when she received a page from one of her daughters at either 5:00 p.m. or 6:00 p.m. The page was from the home of appellant's grandmother in Westley. She called her daughter but did not speak to appellant. Ms. Alardin called her mother's house in Grayson around 6:00 p.m. Her daughter answered the telephone, and Ms. Alardin heard noise, music, and several voices in the background. She asked to speak with appellant, and she heard her daughter go outside to get him. Appellant took the telephone, and she told him that she wanted him to clean up the girls.

Ms. Alardin testified that she received a page from her mother's house and called back around 7:30 p.m. She spoke with appellant and told him not to fall asleep because he was not going to stay overnight. She got home around 8:30 p.m. and appellant was still there with Arthur, George, and another friend, Ricky. Ms. Alardin drove appellant back to Westley while the girls stayed at her house. Ms. Alardin noticed there were several police cars on River Road in Grayson. Appellant said he learned from her brother that Bobby had been shot. They drove by the orchard and saw the car, and appellant asked her if she recognized the car. She had never seen the car before.

Ms. Alardin testified that she took the children to school the next day and went to work. Later in the day, the school called her and reported her older daughter was very upset about an incident which occurred the previous night, other children were saying that her father was involved, and she needed to pick up the child. Ms. Alardin called appellant, told him about the school's call, and told him to pick up the child and immediately clear things up. She picked up both children from the grandmother's trailer in Westley that night.

Ms. Alardin testified that she had regular contact with appellant about the children's schedule for the next three days. Appellant was still living in his

33.

grandmother's trailer.  She also heard rumors the police were looking for him.  During a telephone conversation, she asked appellant if he was going to turn himself in.  Appellant said he hoped "they would sort things out and then he would be able to come back and that way he didn't have to spend time in jail."

Ms. Alardin testified that she was contacted by Detective Callandrillo about a week after the murder, and she told him to speak with her mother because appellant was at their home that night.  Ms. Alardin admitted that she knew appellant planned to run away, but she did not tell Callandrillo about appellant's plans.  She told Callandrillo that some people had written letters concerning appellant's presence at her mother's house the night of the murder.  Her mother gave the statements to her, but she did not give them to the investigators because she assumed the statements would be lost.  Ms. Alardin gave copies of these statements to defense counsel and kept the originals, but she could not find the documents prior to trial.

On the last day of testimonial evidence, Ms. Alardin finally found the original documents written by Marty and Henline about appellant's alibi.  Mr. Peacock also found his copies, which had been placed in the wrong file.

Ms. Alardin never told the district attorney's office that there were alibi witnesses who could exonerate appellant and did not ask her mother or brother to talk to the investigators because "you guys wouldn't listen."  She knew about appellant's preliminary hearing but did not attend it and did not know the alibi statements had been lost.  She did not realize that the district attorney did not know about the alibi evidence until February 2001.

After appellant disappeared from Westley, Ms. Alardin repeatedly received pages from the sheriff's department, and they accused her of aiding and abetting and hiding appellant.  She tried to tell the officers about appellant's alibi, but one detective replied, " 'He can tell it to the judge.' "  The officers also spoke to her real estate employer as to whether she was using her lock box key to hide appellant in one of her vacant listed

34.

homes. Another detective paged her when the officers had surrounded a warehouse and were trying to find appellant. Ms. Alardin went to the area and offered the detective her lock box key to gain entry and started to tell the detective about appellant's alibi. The detective threatened to arrest her and told her to leave.

Ms. Alardin decided to send her mother and the children to Las Vegas because she did not want them "catching heat" from the people in Grayson. She was aware that appellant called the children. In May 1999, Ms. Alardin left Grayson and moved to Turlock, but she still heard about the murder and saw the wanted posters. "Every time I told the police where I was at, [the posters] dramatically appeared." She finally obtained legal assistance as a result of these contacts.

**Apprehension of Appellant**

Ms. Alardin testified that appellant called her every two weeks while he was on the run. She insisted she informed Detective Callandrillo every time she received a telephone call from appellant. Ms. Alardin received another telephone call from appellant in July 1999. She told him that she was taking the children on a trip, and appellant asked to go. She replied, "[N]o way, I didn't want him to go. He said he would meet us there. I said no. And finally I agreed, but on one condition, that he was going to turn himself in.…"

Ms. Alardin made reservations for the four of them to go to Disneyland. Her mother asked about the fourth reservation and thought her brother was going with them. Ms. Alardin replied appellant was going on the trip, but he was going to return with them and turn himself in. "He just wanted some pictures at Disneyland with the kids before he was going to do this. And my mom told my dad and my dad turned [appellant] in."

Ms. Alardin testified that during trial, she saw Gilbert Ybarra talking with George I. in the hallway before George testified. They started to talk about the trial, and Gilbert pulled George around the corner where they talked for five to 10 minutes.

35.

The defense introduced appellant's medical records as to his ankle surgery in November 1998. Ms. Alardin testified that he could not move around and stayed with her immediately after the surgery. As of March 1999, he was not using crutches, he had some mobility, and he was allowed to put weight on his foot, but he had a bad limp. However, he "had sweat dripping off of him any time he did too much. And I only know that because I had to do all the chores."

## REBUTTAL EVIDENCE

Sergeant Heyne testified he participated in the search of a warehouse in Patterson where appellant was suspected to be hiding because it was listed for sale with Ms. Alardin. Heyne contacted her and she drove to the scene. Heyne testified Ms. Alardin never approached him with information about appellant's alibi. He would have interviewed her if he had received such information.

Mike Garcia testified he did not know appellant's wife and had hardly seen her. Mike testified that he never had a dispute with Bobby, Bobby was his friend, and Ms. Alardin never intervened in any dispute with him.

Deputy District Attorney Douglas Maner testified that he was initially in charge of the instant case. He never saw the alibi statements written by Marty Espinoza and Robert Henline until the documents were produced on the last day of trial. He would have ordered an investigation of these statements if he had seen them. He never received any alibi statements from either defense counsel or Mr. Peacock.

John Mallin, an investigator with the sheriff's department, testified that he learned about the alibi statements in February 2001. He attempted to interview the relevant witnesses, but he only was able to contact a few people who were willing to talk. He contacted Robert Henline in prison, who said he saw appellant inside Ms. J.'s home. Henline rode home on his bicycle, then heard the gunshots followed shortly by police sirens. Henline never said he saw appellant and his children arrive in a car, or that he saw a car drive away from Ms. J.'s house.

Mallin spoke to Ms. Alardin over the telephone, and eventually contacted her parents. Ms. Alardin's father and brother refused to speak with anyone about the case. He tried to speak to George I. and Marty Espinoza, but they never returned his calls.

Detective Callandrillo testified that an attorney contacted him a few days after the murder, and said Ms. Alardin was irate and felt harassed because wanted posters had been distributed near her house. Callandrillo explained he had no control over the posters because they were produced by the victim's family, and he never told the victim's family where Ms. Alardin lived. Callandrillo asked the attorney for the address where her mother and children were living in Las Vegas, in order to watch the residence in case appellant showed up. Ms. Alardin provided this information.

Detective Callandrillo spoke with Ms. Alardin during the investigation, and she said she had no idea where appellant was. Ms. Alardin never said she knew anything about appellant's whereabouts at the time of the murder. Ms. Alardin never informed Callandrillo about appellant's telephone calls when he was a fugitive. Callandrillo testified defense counsel was cooperative in passing information between the investigators and Ms. Alardin. However, Callandrillo believed Ms. Alardin was not cooperative with the officers: "The fact that, when [appellant] was apprehended, she was going to go to Great America [*sic*] with him and she was told in advance that he was a fugitive. She knew he was a fugitive, there were fliers out, and she was told about harboring a fugitive."

The sheriff's department finally found appellant hiding in his grandmother's trailer. Detective Callandrillo testified that he was never contacted about appellant's alleged alibi by Ms. J., Arthur J., George I., Robert Henline, or anyone else. He would have conducted follow-up interviews with these witnesses if he had been informed of the alibi information.

37.

## PROCEDURAL BACKGROUND

**The Charges**

On July 12, 2000, an information was filed in Stanislaus County Superior Court charging appellant Alardin, and codefendants Felipe Solorio and Jeffrey Muniz, with count 1, first degree murder of Robert Ybarra (§ 187).

As to appellant, it was further alleged he personally used a firearm (§ 12022.5) and was a principal in the offense when at least one principal intentionally and personally discharged a firearm, proximately causing bodily injury to a person other than an accomplice (§§ 12022.7, 12022.53, subds. (d) & (e)(1).) Appellant pleaded not guilty and denied the enhancements.

On February 15, 2001, the court granted appellant's motion for severance of his trial from the codefendants.

In approximately March 2001, codefendant Muniz pleaded guilty to assault with a firearm pursuant to a negotiated disposition in which he agreed to testify against appellant and was sentenced to four years in prison. An arrest warrant was issued for codefendant Solorio, but he was still wanted at the time of appellant's trial.

On April 9, 2001, appellant's jury trial began with motions in limine.

**Closing Arguments**

In their closing arguments, both attorneys extensively discussed the testimony of each witness, addressed inconsistencies between their pretrial statements and trial testimony, and sought to undermine the credibility of the other side's witnesses.

### *The Prosecutor's Argument*

The prosecutor argued the evidence showed that Felipe was driving the red vehicle, appellant was in the front passenger seat, and appellant got out of the car and shot Bobby in the head and upper torso. The prosecutor asserted appellant was guilty of first degree premeditated murder, "there was plenty of premeditation when you get out of

a car and blow a man away as he did," and he committed a "cold, callous murder." (*People v. Alardin*, *supra*, F039369 at p. 80.)

The prosecutor addressed the testimonies of Jeff Muniz and Mike Garcia and acknowledged they could be found to be aiders and abettors and accomplices to the murder. The prosecutor extensively discussed the accomplice instructions, and that the testimony of an accomplice had to be corroborated and viewed with caution. The prosecutor explained the jury had to determine if Muniz and/or Garcia were accomplices, and if their testimony was corroborated and argued their testimony was corroborated and credible.

The prosecutor next discussed appellant's alleged alibi and argued the defense witnesses were not credible because they failed to previously disclose this information to the investigators. Appellant tried to intimate the prosecution's witnesses, and the jail "kite" showed his consciousness of guilt.

The prosecutor reviewed the instructions about murder and express and implied malice. The prosecutor noted there was an instruction on felony murder but stated he was not relying on a felony-murder theory in this case. The prosecutor argued appellant acted with premeditation, intent to kill, and express malice because he put a mask over his face, pulled out a shotgun, and blasted Bobby four times at close range in the head and upper torso.

The prosecutor advised the jury that in the alternative, there were two theories of second degree murder. Under one theory, appellant was guilty of second degree murder if the jury found he killed Bobby but did not act with premeditation. The second possible theory was the jury could find him guilty of second degree murder based on implied malice because he acted with conscious disregard for life. The prosecutor asserted this theory would apply if the jury believed the testimony that Garcia allegedly heard Felipe

39.

tell appellant to only shoot Ybarra in the legs but argued Garcia's statement on this point was not credible.[12]

The prosecutor further addressed the lesser offense of involuntary manslaughter based on appellant's alleged voluntary intoxication that would negate malice, because appellant would have committed a misdemeanor offense "such as brandishing a weapon" and then fired it, resulting in Bobby's death.

### Defense Counsel's Argument

Defense counsel agreed the primary issue was the credibility of the witnesses. He argued Jeff Muniz and Mike Garcia lied about appellant's involvement in the shooting and gave inconsistent statements because they were accomplices to the murder, and their testimony could not be corroborated and was inconsistent with their prior statements. Defense counsel explained that an accomplice was guilty of a confederate's intended crime, and, also for any natural and probable consequences of any act he knowingly aided and abetted. Even if Muniz and Garcia thought someone was only going to fire a warning shot, they were still guilty of murder as accomplices, and their testimony had to be corroborated. Defense counsel extensively reviewed the prosecution evidence and argued their testimony was not corroborated and could not be relied on to convict appellant.

Defense counsel asserted all the evidence pointed to Felipe as the gunman. Felipe was the only person who that a problem with Bobby and a motive to kill him because of Bobby's fight with Felipe's brother at the market. In addition, Muniz initially reported that Felipe said he had shot someone.

Defense counsel further argued the alibi witnesses were credible and reliable, and raised a reasonable doubt whether appellant was present at the homicide. Based on the

---

[12] As will be discussed below, the jury instructions included language about felony murder, but the prosecutor advised the jury that the instruction did not apply to the evidence. Defense counsel did not address felony murder.

alibi evidence, only Felipe, Muniz, and Garcia were in the vehicle when the murder occurred, Muniz was driving, Garcia was in the back seat, Felipe was the shooter who got out of the car and killed Bobby, and Felipe and his entire family disappeared within a week of the murder.

### *The Prosecutor's Rebuttal*

In rebuttal, the prosecutor again extensively reviewed evidence that corroborated the testimony of Muniz and Garcia. The prosecutor argued appellant's self-serving alibi evidence was refuted by the other evidence that showed appellant was the killer who committed a vicious murder.

## Jury Instructions

We will address the jury instructions below. In brief, the jury was instructed on the liability of principals, aiders and abettors, direct aiding and abetting, and accomplices, that it had to determine whether Muniz and/or Garcia were accomplices, and that the testimony of an accomplice had to be corroborated. The jury was also instructed on the elements of first and second degree murder, premeditation, and express and implied malice, the alleged firearm enhancement, assault with a firearm as the basis for implied malice and second degree murder, and the lesser offense of involuntary manslaughter. As will be explained, the instructions also included language about the felony-murder rule and the natural and probable consequences doctrine.

## Jury Questions

On April 30, 2001, the jury began deliberations.

On May 2, 2001, the jury sent a question to the court about the personal discharge enhancement: "We have a question regarding the guilty verdicts, specifically that [appellant] was or was not a principal in the foregoing offense, discharge of [a] firearm." The court and the parties agreed that the court would send a written response that the jury could review CALJIC No. 17.19.5 that defined the elements for personal discharge enhancement, and CALJIC No. 3.00 that defined a principal.

41.

Later that day, the jury sent another question to the court: "Do we have to come to a decision on the enhancement?" The court and the parties agreed to send a written response that stated: "No." On the same day, the jury sent another note that it was unable to reach a verdict on the personal discharge enhancement, and that further deliberations would not result in a verdict that was unanimous. The court called the jury into the courtroom and asked if anyone felt that further deliberations would be helpful; the jurors said no. The foreperson stated the vote on the enhancement was "ten yes, two no."

**Verdict and Sentence**

Also, on May 2, 2001, the jury found appellant guilty of first degree murder. The jury was unable to reach a finding on the personal discharge enhancement. The court declared a mistrial on the enhancement and granted the prosecution's motion to dismiss.

On September 18, 2001, the court denied appellant's motion for new trial that was based on alleged prosecutorial misconduct in closing argument. The court denied probation and imposed the indeterminate term of 25 years to life for first degree murder, to be served consecutively to the sentence imposed in Stanislaus Superior Court case No. 1015269.[13] Appellant filed a notice of appeal. (*Alardin II*, *supra*, F039052.)

**APPELLANT'S DIRECT APPEAL**

On April 9, 2003, this court filed the nonpublished opinion in appellant's direct appeal that affirmed the judgment. (*People v. Alardin*, *supra*, F039369.)

---

[13] In *People v. Alardin* (Nov. 21, 2002, F039052 [nonpub. opn.] (*Alardin II*)), this court affirmed appellant's conviction of possession of a sharpened wire in jail (§ 4502) and assault with a deadly and dangerous weapon with the infliction of great bodily injury on another (§ 245, subd. (a)(1); § 12022, subd. (b); § 12022.7), based on his assault of fellow inmate Jesse Edwards at the Stanislaus County Jail on October 29, 2000. He was sentenced to seven years in prison. (*Alardin II,* at p. 3, fn. 2.)

Appellant argued the court should have given his proffered instructions on the credibility of accomplices that were critical for the jury to evaluate the credibility of Jeff Muniz and Mike Garcia.

We reviewed the trial court's lengthy discussions of the accomplice instructions with the parties throughout the trial, and held the jury was correctly instructed with the pattern instructions on accomplices and credibility that sufficiently addressed appellant's concerns. We found appellant's proposed instructions on accomplices and corroboration were duplicative of the pattern instructions that "constituted the 'full array of accomplice instructions' and properly addressed corroboration and credibility of accomplices." (*People v. Alardin*, *supra*, F039369, at p. 69.)

We further held that if the jury found both Muniz and Garcia were accomplices, the jury was correctly instructed that an accomplice's testimony had to be corroborated by other evidence independent of the accomplice's testimony (CALJIC Nos. 3.11, 3.12, 3.13, and 3.18). (*People v. Alardin*, *supra*, F039369, at p. 69); and there was sufficient independent evidence "which connects appellant with the murder and corroborates the testimony of both Jeff Muniz and Mike Garcia." (*Id.* at pp. 72–73.)

We rejected appellant's other contentions and held the trial court properly admitted and authenticated the jailhouse "kite" allegedly sent from appellant to Muniz (*People v. Alardin*, *supra*, F039369, at pp. 38–60), and appellant's numerous claims of prosecutorial misconduct arising from closing argument lacked merit and his new trial motion based on that alleged misconduct was correctly denied (*id.* at pp. 79–107).

**APPELLANT'S PETITION**

On March 12, 2021, appellant filed, in pro. per., a petition for resentencing on his first degree murder conviction pursuant to former section 1170.95, and requested appointment of counsel.

Appellant filed a supporting declaration consisting of a preprinted form, and checked boxes that he was eligible for resentencing because a complaint, information, or

43.

indictment was filed that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; at trial, he was convicted of first or second degree murder pursuant to the felony-murder rule or the natural and probable consequences doctrine; and he could not now be convicted of first or second degree murder under the amended versions of sections 188 and 189 because he was not the actual killer, he did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of first degree murder, and he was not a major participant and did not act with reckless indifference to life.

**The Superior Court's Denial of the Petition**

The court did not appoint counsel, request a response from the People, or hold a hearing on the petition.

On or about April 9, 2021, the court filed an order that denied appellant's request for counsel and his petition without issuing an order to show cause. The court's order summarized the procedural history leading to appellant's conviction and sentence, addressed the statutory requirements to obtain relief that were applicable at the time, and made the following findings.

> "Prior to the appointment of counsel, the trial court shall review the petition and determine if the petitioner has made a prima facie showing that the petition falls within the provisions of this section. [Citation.] The court determines, based upon its review of readily ascertainable information in the record of conviction and the court file, whether the petitioner is statutorily eligible for relief. [Citation.] The court is not limited to the allegations in the petition when determining whether the petitioner has stated a prima facie claim for relief under [former] section 1170.95. The court may consider the entire record of conviction and subsequent appellate opinion. (*People v. Law* (2020) 48 Cal.App.5th 811, 820–821.)

> "The petitioner has not made a prima facie showing he is entitled to relief. *Though the petitioner avers otherwise the record of proceedings clearly indicated the petitioner was the actual killer and could still be convicted of murder under revised Penal Code section 188 and 189. The*

44.

*record of conviction establishes petitioner's ineligibility for resentencing as a matter of law.*

"The court has now provided a 'brief statement of the reasons' why the petition is denied. (Cal. Rules of Court, rule 4.551(g).) Because the court concludes petitioner is not reasonably entitled to relief, and because this determination does not require resolution of a contested question of fact, no evidentiary hearing is necessary. (Cal. Rules of Court, rule 4.551(f).)"[14] (Italics added.)

On May 10, 2021, appellant filed a notice of appeal from the court's order that denied his petition.

## DISCUSSION

### I. Former Section 1170.95/Section 1172.6

As we will explain, the superior court denied appellant's petition based on a series of cases that have since been overruled by the California Supreme Court. We thus begin with Senate Bill 1437's amendments of sections 188 and 189, the enactment of former section 1170.95, now renumbered as section 1172.6, and subsequent statutory amendments.

#### A. Senate Bill 1437

Senate Bill No. 1437 (2017–2018 Reg. Sess.) became effective on January 1, 2019, and amended " 'the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)

"Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now

[14] As will be discussed below, at the time of the superior court's order, there were divisions of authority about whether the court was required to appoint counsel and conduct a hearing prior to determining whether a petition stated a prima facie case for relief under the then-applicable provisions of former section 1170.95.

amended, addresses felony murder liability." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723; *People v. Gentile* (2020) 10 Cal.5th 830, 842 (*Gentile*).)[15]

"In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill 1437 added [former] section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis, supra*, 11 Cal.5th at p. 959.)

"Pursuant to [former] section 1170.95, an offender must file a petition in the sentencing court averring that:  '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;]  [¶]  (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;]  [¶]  [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to section 188 or 189 made effective January 1, 2019.'  [Citations.]  Additionally, the petition shall state '[w]hether the petitioner requests the appointment of counsel.'  [Citation.]  If a petition fails to comply with subdivision (b)(1), 'the court may deny the petition without prejudice to the filing of another petition.' "  (*Lewis, supra*, 11 Cal.5th at pp. 959–960.)

"Where the petition complies with [former] section 1170.95, subdivision (b)'s three requirements, then the court proceeds to subdivision (c) to assess whether the petitioner has made 'a prima facie showing' for relief.  [Citation.]  [¶]  If the trial court determines that a prima facie showing for relief has been made, the trial court issues an

---

[15] As amended, section 189, subdivision (f) states an exception that allows "individuals to be convicted of felony murder even if they did not act with malice and do not fall in one of the three categories of section 189, subdivision (e), where the victim is a peace officer engaged in the course of his or her duties and the defendant knows (or reasonably should know) these facts." (*People v. Hernandez* (2021) 60 Cal.App.5th 94, 99.)

order to show cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not … previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' [Citation.] 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' [Citation.] At the hearing stage, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' " (*Lewis, supra,* 11 Cal.5th at p. 960.)

### B. *Lewis*

In July 2021, the court decided *Lewis* and addressed when the right to appointed counsel arose upon filing a former section 1170.95 petition, whether the superior court could consider the record of conviction to determine if the petition made a prima facie showing of eligibility for relief, and acknowledged there were conflicting opinions on these issues. (*Lewis, supra*, 11 Cal.5th at pp. 957–958, 961–963.)

*Lewis* resolved these conflicts and held that under former section 1170.95, petitioners "are entitled to the appointment of counsel upon the filing of a facially sufficient petition [citation] and that only *after* the appointment of counsel and the opportunity for briefing may the superior court consider the record of conviction to determine whether 'the petitioner makes a prima facie showing that he or she is entitled to relief.' " (*Lewis, supra*, 11 Cal.5th at p. 957.) " 'If the petitioner has requested counsel, the court *shall* appoint counsel to represent the petitioner.' " (*Id*. at p. 963, italics added in original.)

*Lewis* also held that "at the prima facie stage, a petitioner's allegations should be accepted as true, and the court should not make credibility determinations or engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis, supra,* 11 Cal.5th at p. 974.) When the court conducts the prima facie determination,

47.

former section 1170.95, subdivision (b)(2) only permits screening out "noncomplying petitions, not petitions that lack substantive merit." (*Lewis,* at p. 968.)

Lewis further held that after appointing counsel, the trial court may rely on the record of conviction to determine whether the prima facie showing has been made in order "to distinguish petitions with potential merit from those that are clearly meritless." (*Lewis, supra*, 11 Cal.5th at pp. 970–971.) "While the trial court may look at the record of conviction after the appointment of counsel to determine whether a petitioner has made a prima facie case for [former] section 1170.95 relief, the prima facie inquiry under subdivision (c) is limited. Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' " (*Lewis,* at p. 971.)

" 'However, if the record, *including the court's own documents*, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Lewis, supra*, 11 Cal.5th at p. 971, italics added.)

"Appellate opinions … are generally considered to be part of the record of conviction. [Citation.] However, as we cautioned in [*People v. Woodell* (1998) 17 Cal.4th 448, 457], the probative value of an appellate opinion is case specific, and 'it is certainly correct that an appellate opinion might not supply all answers.' [Citation.] In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' [Citation.] As the People emphasize, the 'prima facie bar was intentionally and correctly set very low.' " (*Lewis, supra*, 11 Cal.5th at p. 972, fn. omitted.)

"[T]here is no categorical bar to consulting the record of conviction at the prima facie stage." (*Lewis, supra*, 11 Cal.5th at p. 972, fn. 6.) "In sum, the parties can, and

should, use the record of conviction to aid the trial court in reliably assessing whether a petitioner has made a prima facie case for relief under [former section 1170.95,] subdivision (c)." (*Id.* at p. 972.)

The prima facie determination is a question of law, and the court may deny a petition at the prima facie stage if the petitioner is ineligible for resentencing as a matter of law. (*Lewis, supra*, 11 Cal.5th at p. 966.)

*Lewis* announced a prejudicial error standard under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*), if the trial court failed to appoint counsel or violated the petitioner's statutory rights under section 1170.95, and the petitioner must "therefore 'demonstrate there is a reasonable probability that in the absence of the error he [or she] … would have obtained a more favorable result.' " (*Lewis, supra*, 11 Cal.5th at p. 974.)

Therefore, to demonstrate prejudice from the denial of a petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his or her petition would not have been summarily denied without an evidentiary hearing. (*Lewis, supra*, 11 Cal.5th at pp. 972–974; *Watson, supra,* 46 Cal.2d at p. 836.)

### C.  *Senate Bill No. 775*

In October 2021, after *Lewis* was decided, Senate Bill No. 775 was enacted and amended former section 1170.95, effective on January 1, 2022, to codify the holding in *Lewis*. (2020–2021 Reg. Sess. (Stats. 2021, ch. 551, § 1) (Senate Bill 775).) As noted above, effective June 30, 2022, former section 1170.95 was renumbered section 1172.6, with no change in the text or designation of the subdivisions previously amended by Senate Bill 775. (Stats. 2022, ch. 58, § 10.)

As a result of Senate Bill 775's amendments, section 1172.6 clarified that "persons convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable

49.

consequences doctrine, or manslaughter," may file a petition to have that conviction vacated under certain circumstances. (§ 1172.6, subd. (a), italics added.)

The amendments also codified the holding in *Lewis* that "[u]pon receiving a petition in which the information required by this subdivision is set forth …, if the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner." (§ 1172.6, subd. (b)(3).) After the petition is filed, the People shall file a response and the petitioner may serve a reply. (*Id.*, subd. (c).)

After the parties have the opportunity to submit briefs, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (§ 1172,6, subd. (c).) If the petitioner makes the prima facie showing, "the court shall issue an order to show cause." (*Ibid.*) If the court declines to issue an order to show cause, "it shall provide a statement fully setting forth its reasons for doing so." (*Ibid.*)

If an order to show cause is issued, "the court shall hold a hearing to determine" whether to vacate the petitioner's conviction, recall the sentence, and resentence petitioner. (§ 1172.6, subd. (d)(1).) At the hearing, the prosecution has the burden to prove beyond a reasonable doubt that petitioner is guilty of murder or attempted murder under the amended versions of sections 188 and 189. (*Id.*, subd. (d)(3).)

"At the hearing to determine whether the petitioner is entitled to relief … [t]he admission of evidence in the hearing shall be governed by the Evidence Code, except that the court *may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion*. However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is

substantial evidence to support a conviction for murder … is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1172.6, subd. (d)(3), italics added.)

If the superior court finds a prima facie case and issues an order to show cause, it shall conduct an evidentiary hearing and "review all the relevant evidence, evaluate and resolve contradictions, and make determinations as to credibility, all under the reasonable doubt standard …." (*People v. Clements* (2022) 75 Cal.App.5th 276, 298.) In resolving a section 1172.6 petition, the trial judge "isn't charged with holding a whole new trial on all the elements of murder. Instead, the parties will focus on evidence made relevant by the amendments to the substantive definition of murder." (*Ibid.*)

On appeal from the court's ruling after an evidentiary hearing, "[w]e review the trial judge's fact finding for substantial evidence. [Citation.] We ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence – that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*People v. Clements, supra*, 75 Cal.App.5th at p. 298.) The appellate court's review determines "whether there is any substantial evidence, contradicted or uncontradicted, to support a rational fact finder's findings beyond a reasonable doubt." (*Ibid.*)

## II.   The Superior Court's Failure to Comply with Section 1172.6

Appellant argues the superior court committed prejudicial error because it violated the procedures set forth in *Lewis* and section 1172.6 and denied his petition without appointing counsel, obtaining briefing from the parties, or conducting a hearing, and the court improperly made factual findings from the record to find he was the actual killer before it issued an order to show cause.

51.

### A.     *Application of Lewis and the Amended Statute.*

The superior court denied appellant's petition in April 2021, before *Lewis* was decided and enactment of the statutory amendments by Senate Bill 775.  However, the statutory amendments are applicable to his case since it is not yet final on appeal.  (See, e.g., *People v. Porter* (2022) 73 Cal.App.5th 644, 652; *People v. Vieira* (2005) 35 Cal.4th 264, 306; *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 306–309.)

The superior court erroneously denied appellant's petition and determined he failed to make a prima facie case for relief without granting his request for appointment of counsel, obtaining briefing from the parties, and conducting a hearing before it declined to issue an order to show cause.

The superior court gave a statement of reasons when it denied appellant's petition without issuing an order to show cause, as required by section 1172.6, subdivision (c).  However, the court's denial appeared to be based on making factual findings that appellant was the actual killer.  The court stated it was denying the petition without resolving "a contested question of fact," but that it reviewed "readily ascertainable information in the record of conviction and the court file," it could consider "the entire record of conviction and subsequent appellate opinion," and "the record of proceedings clearly indicated [appellant] was the actual killer."

The superior court thus violated section 1172.6 by denying appellant's petition without appointing counsel, requesting briefing, conducting a hearing, and possibly engaging in premature factfinding at the prima facie stage.  (§ 1172.6, subds. (c), (d)(3).)

Nevertheless, we may affirm the court's denial of the petition if appellant was not prejudiced by these statutory errors.  (*Lewis, supra*, 11 Cal.5th at pp. 972–974.)  Appellant must show that absent the statutory errors, there is a reasonable probability he would have obtained a more favorable result.  (*Ibid.*; *People v. Watson, supra*, 46 Cal.2d at p. 836.)

**B.**     *Review of the Record for the Prima Facie Finding*

It is now settled that the opinion from a petitioner's direct appeal is part of the record of conviction that may be considered to determine whether the petition made a prima facie showing of resentencing eligibility. (*Lewis, supra*, 11 Cal.5th at p. 972.)

The role of the appellate opinion is circumscribed, however, and the court may not engage in factfinding based on the appellate opinion at the prima facie stage. (*Lewis, supra*, 11 Cal.5th at pp. 971–972; § 1172.6, subd. (d)(3).) While we have relied on our prior opinion and the trial record for the factual statement set forth above, we have done so only to provide context to the parties' arguments in this appeal. We cannot rely on this factual statement to make factual findings to resolve the prima facie issue and determine whether the court's statutory errors were prejudicial.

The court may rely on the case's procedural history to make the prima facie determination. This includes the jury instructions, which are part of the record of conviction, because the instructions "given at a petitioner's trial may provide 'readily ascertainable facts from the record' that refute the petitioner's showing, and reliance on them to make the eligibility or entitlement determinations may not amount to 'factfinding involving the weighing of evidence or the exercise of discretion,' " which must wait to occur until after an order to show cause issues. (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1055, overruled to the extent that it is not inconsistent with *Lewis, supra*, 11 Cal.5th 952.)

The record of conviction for purposes of section 1172.6 has also been interpreted to include the parties' closing arguments. (*People v. Jenkins* (2021) 70 Cal.App.5th 924, 935.) The ability to rely on closing arguments to determine whether the petitioner is ineligible for relief as a matter of law is limited, however, because "[i]t is elementary … that the prosecutor's argument is not evidence and the theories suggested are not the exclusive theories that may be considered by the jury." (*People v. Perez* (1992) 2 Cal.4th 1117, 1126.)

We turn to appellant's claims of prejudicial error.

## III. Appellant Was Ineligible for Relief as a Matter of Law

Appellant asserts his petition made a prima facie case for resentencing and the court improperly made factual findings from the record to find he was the actual killer, in violation of *Lewis* and section 1172.6.  Appellant argues that even if the instructions were considered, the record does not show how the jury arrived at the verdict, the jury was instructed on both the felony-murder rule and the natural and probable consequences doctrine, and he is entitled to issuance of an order to show cause and an evidentiary hearing.

The People reply that appellant is ineligible for resentencing as a matter of law because the instructions show he was convicted as a direct aider and abettor who acted with premeditation and the intent to kill, this theory is still valid after the amendments enacted by Senate Bills 1437 and 775, and the superior court's statutory errors are not prejudicial.

### A.    *The Jury's Verdict and the Personal Discharge Enhancement*

A petitioner is ineligible for resentencing under section 1172.6 if he or she was the actual killer, acted with the intent to kill, or was a major participant in the underlying felony who acted with reckless indifference to human life.  (§§ 188, subd. (a)(3), 189, subd. (e), 1172.6, subd. (a)(3); see *People v. Gentile, supra*, 10 Cal.5th at p. 842.)  As relevant to the instant case, if the petitioner was not the actual killer, then a person "convicted of felony murder or murder under the natural and probable consequences doctrine or other theory *under which malice is imputed to a person based solely on that person's participation in a crime*" may have that conviction vacated if the petitioner "could not presently be convicted of murder … because of changes to Section 188 or 189…."  (§ 1172.6, subd. (a), (e), italics added.)

While we may not make factual findings to determine if appellant was ineligible for relief as a matter of law, we have set forth the factual statement from our opinion in

appellant's direct appeal to give context to the jury instructions, the parties' closing arguments, and the jury's verdict. In closing argument, the prosecutor asserted Felipe was driving the car, and appellant was the gunman who shot and killed Bobby. In contrast, defense counsel asserted the alibi witnesses were credible, appellant was not at the murder scene, and there was a reasonable doubt as to his guilt.

It is not necessary to resort to factual findings to conclude that appellant's conviction for first degree premeditated murder indicates the jury rejected the defense's alibi theory. The verdict by itself, however, does not resolve the question of whether he was convicted either as the actual killer or a direct aider and abettor, and if he is ineligible for relief under section 1172.6 as a matter of law, without making factual findings.

**B.** *The Personal Discharge Enhancement*

Appellant argues that the jury's inability to make a finding on the personal discharge enhancement prevents the conclusion that he was convicted as the actual killer. We agree. At the beginning of the instructions, the court read the murder charge to the jury and also that appellant was alleged to be "a principal in the foregoing offense and in the commission of the offense did personally discharge a firearm and proximately cause[d] death to a person other than an accomplice within the meaning of Section 12022.53(d)…. During the commission of the above charged offense, the defendant personally used a firearm in violation of Section 12022.5."

After it read the murder instructions, the court gave CALJIC No. 17.195 on the elements of the enhancement:

> "It is alleged that the defendant intentionally and personally discharged a firearm and proximately caused death to a person other than an accomplice during the commission of the crime charged. [¶] If you find the defendant guilty of the crime thus charged, you must determine whether the defendant intentionally and personally discharged a firearm and proximately caused death to a person other than an accomplice in the commission of that felony.

"The word firearm includes a shotgun. [¶] The term intentionally and personally discharged a firearm as used in the instruction means that the defendant himself intentionally discharged it. [¶] A proximate cause of death is an act or omission that sets in motion a chain of events that produces the death as a direct, natural, and probable consequence of the act or omission and without which the death would not have occurred…." (Italics added.)

The jury was unable to reach a verdict on whether the personal discharge enhancement was true, and the court declared a mistrial on the enhancement and granted the prosecution's motion to dismiss it. In some circumstances, a jury's true finding on a personal use enhancement attached to a murder conviction may establish that the petitioner was convicted as the actual killer and thus ineligible for relief under section 1170.95. (See, e.g., *People v. Garrison* (2021) 73 Cal.App.5th 735, 743, 747; but see also *People v. Jones* (2003) 30 Cal.4th 1084, 1120; *People v. Young* (2005) 34 Cal.4th 1149, 1205.) We are not presented with this potential issue since the jury was unable to reach a finding on the personal discharge enhancement.

Appellant further argues the jury's questions during deliberations, together with its inability to reach a finding on the enhancement, gives the "strong indication" that it erroneously treated "discharge of a firearm as a separate offense" and "a discrete offense charged against [him]," and "indicates inconsistency in the jury's determination of the case." We disagree with this claim because appellant's assumptions are undermined by the jury's actual questions to the court. First, the jury asked whether appellant "was or was not a principal in the foregoing offense, discharge of [a] firearm." The court directed the jury to review CALJIC No. 17.19.5, that defined the elements for personal discharge enhancement, and CALJIC No. 3.00, that defined a principal. Next, the jury asked: "Do we have to come to a decision on the enhancement?" In asking this question, the jury did not express any confusion about the court's prior reference to the instruction that defined the personal discharge enhancement. Finally, the jury reported to the court that that it

was unable to reach a verdict on the personal discharge enhancement and further deliberations would not help.

The procedural record thus establishes the jury's questions about "discharge of a firearm" were about the personal discharge enhancement, it did not erroneously believe it was a separate offense, and verdicts were not inconsistent since, as we will explain below, the instructions permitted the jury to convict appellant of first degree murder under the direct aiding-and-abetting theory.

### C.     *Aiding and Abetting*

Given the jury's inability to reach a finding on the firearm enhancement, the instructions raise the possibility that the jury did not convict appellant as the actual killer but as an aider and abettor to first degree premeditated murder.  The People assert the instructions show that appellant was convicted of first degree premeditated murder based on principles of direct aiding and abetting, that have not been negated by the amendments enacted by Senate Bills 1437 and 775.

"Generally, a defendant may be convicted of a crime either as a perpetrator or as an aider and abettor."  (*In re Loza* (2018) 27 Cal.App.5th 797, 801, fn. omitted; *People v. Williams* (2015) 61 Cal.4th 1244, 1268.)  "A person who aids and abets the commission of a crime is culpable as a principal in that crime.  [Citation.]  Aiding and abetting is not a separate offense but a form of derivative liability for the underlying crime."  (*Gentile, supra*, 10 Cal.5th at p. 843.)

"An aider and abettor can be held liable for crimes that were intentionally aided and abetted (target offenses); an aider and abettor can also be held liable for any crimes that were not intended, but were reasonably foreseeable (nontarget offenses).  [Citation.] Liability for intentional, target offenses is known as 'direct' aider and abettor liability; liability for unintentional, nontarget offenses is known as the ' " 'natural and probable consequences' doctrine." ' "  (*In re Loza, supra,* 27 Cal.App.5th at p. 801.)

## 1. Direct Aiding and Abetting

Under the direct theory of aiding and abetting, "an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.' " (*Gentile, supra*, 10 Cal.5th at p. 843.) The prosecution "must show that the defendant acted 'with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' " (*People v. Gomez* (2018) 6 Cal.5th 243, 279; see also *People v. Chiu* (2014) 59 Cal.4th 155, 158 (*Chiu*), superseded by statute in part as stated in *Gentile*, *supra*, 10 Cal.5th at pp. 848–849, and *Lewis, supra*, 11 Cal.5th at p. 959, fn. 3.)

In order to convict a defendant of first degree premeditated murder as a direct aider and abettor, "the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Chiu, supra*, 59 Cal.4th at p. 167.) A direct aider and abettor to first degree premeditated murder must aid or encourage the direct perpetrator in the commission of the murder, and act with his or her own willfulness, premeditation, and deliberation. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118.)

"Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought." (*Gentile, supra*, 10 Cal.5th at p. 848.)

## 2. Indirect Aiding and Abetting

Under the indirect theory of aiding and abetting, where the offense that "the perpetrator actually commits is different from the originally intended crime, the natural and probable consequences doctrine limits liability to those offenses that are reasonably

foreseeable consequences of the act originally aided and abetted." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 108.)

Under the natural and probable consequence doctrine, "a defendant can be found guilty of murder if he or she aids and abets a crime (i.e., the target crime) and murder (i.e., the nontarget crime) is a natural and probable consequence of that target crime." (*People v. Chavez* (2018) 22 Cal.App.5th 663, 683.) "Vicarious liability is imposed 'for any offense committed by the direct perpetrator that is a natural and probable consequence of the target offense. [Citation.] Because the nontarget offense is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant.' " (*People v. Montes* (2021) 71 Cal.App.5th 1001, 1007.)

In 2014, prior to the enactment of Senate Bill 1437, the California Supreme Court clarified that an aider and abettor could not be convicted of first degree premeditated murder under the natural and probable consequences doctrine. (*Chiu, supra,* 59 Cal.5th at pp. 158–159; *People v. Rivera* (2015) 234 Cal.App.4th 1350, 1356.) Instead, a defendant only could be found guilty of second degree murder under the indirect theory of aiding and abetting based on the natural and probable consequences doctrine. (*Chiu,* at pp. 158–159; *People v. Rivera,* at pp. 1354, 1356.)

The amendments enacted by Senate Bill 1437 superseded that portion of *Chiu* insofar as it "upheld aider and abettor liability for second degree murder under the natural and probable consequences theory." (*Lewis, supra*, 11 Cal.5th at p. 959, fn. 3; *Gentile, supra*, 10 Cal.5th at pp. 848–849.) Senate Bill 1437 thus removed the natural and probable consequences doctrine as the basis for a murder conviction as it applied to aider and abettor liability. (*People v. Roldan* (2020) 56 Cal.App.5th 997, 1004, overruled to the extent that it is not inconsistent with *Lewis, supra*, 11 Cal.5th 952.)

**D.** *Instructions on Principals and Aiders and Abettors*

We now review the instructions given to appellant's jury on the liability of principals and aider and abettors. As explained in this court's opinion in the direct

appeal, one of the primary issues at trial was whether Muniz and/or Garcia were accomplices. The court instructed the jury with the full complement of pattern instructions about accomplices, that it had to determine whether Muniz and/or Garcia were accomplices, defined an accomplice as "a person who is or was subject to prosecution for the identical felony offense *charged against the defendant on trial* by reason of aiding and abetting or being a member of a criminal conspiracy," and that accomplice testimony had to be corroborated. (*People v. Alardin*, *supra*, F039369, at pp. 64–65; 69.)

The accomplice instructions were expressly limited to the liability of Muniz and/or Garcia as accomplices and the credibility of their testimony and compared their potential liability to the offense charged against appellant. However, there were no such limitations on the instructions that specifically addressed aiders and abettors, and the jury could have considered these instructions to determine appellant's guilt.

The court instructed the jury with CALJIC No. 3.00, that "[p]ersons who are involved in committing a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation, is *equally guilty*. Principals include, one, those who directly and actively commit the act constituting the crime, or, number two, those who aid and abet the commission of a crime."[16]

CALJIC No. 3.01 stated the definition of direct aiding and abetting: "A person aids and abets the commission of a crime when he or she, one, with *knowledge* of the unlawful purpose of the perpetrator, and, two, *with the intent or purpose of committing or encouraging or facilitating the commission of the crime, and three, by act or advice aids, promotes, encourages, or instigates the commission of the crime*." (Italics added.)

---

[16] We will address below appellant's arguments that the "equally guilty" phrase in CALJIC No. 3.00 was misleading.

Both appellant and the People agree that the court gave the following special instruction on aiding and abetting, that included language on the natural and probable consequences doctrine:

> "To be an abettor, the one so accused must have instigated or advised the commission of the crime or been present for the purpose of assisting in its commission. He must share the criminal intent with which the crime was committed. [¶] While mere presence alone at the scene of the crime is not sufficient to make the accused a participant, and while he's not necessarily guilty if he does not attempt to prevent the crime through fear, such factors may be circumstances that can be considered by the jury with the other evidence in passing on his guilt or innocence. [¶] One may aid or abet in the commission of a crime without having previously entered into a conspiracy to commit it. [¶] Moreover, the aider and abettor in the proper case is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, *but he is also liable for the reasonable and natural or probable consequences of any act that he knowingly aided and encouraged. Whether the act committed was the natural and probable consequence of the act encouraged and the extent of defendant's knowledge are questions of fact for the jury.*"[17] (Italics added.)

### 1. CALJIC No. 3.02

Appellant correctly states that CALJIC No. 3.02 defines the natural and probable consequences doctrine. (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th 107.) However, appellant asserts the court gave a "modified" version of CALJIC No. 3.02, that further instructed the jury in this case on the natural and probable consequences doctrine, but the court "deleted the identification of both the charged offense and the target offense." Appellant argues the failure of CALJIC No. 3.02 "to identify a specific target crime" did not "transform the nature of the instruction into addressing something other than the natural and probable consequences doctrine; it instead broadened the reach of the

---

[17] According to the clerk's transcript, this special instruction on aiding and abetting was based on *People v. Durham* (1969) 70 Cal.2d 171, quoting *People v. Villa* (1957) 156 Cal.App.2d 128.

61.

doctrine to include murder liability for aiding and abetting any unspecified criminal behavior."[18]

The record from the direct appeal of appellant's trial does not support appellant's assertion that a version of CALJIC No. 3.02 was given. The clerk's transcript includes the printed instruction for the entirety of CALJIC No. 3.02 that fully defined the natural and probable consequences doctrine and identified the target offense as assault with a firearm and the nontarget offense as murder. However, there are notations on this proposed instruction that it was withdrawn and not given.

The clerk's transcript also includes a modified version of the same printed copy of CALJIC No. 3.02. The first paragraph appears highlighted at the margin; that paragraph states: "One who aids and abets another in the commission of a crime is not only guilty of that crime, but is also guilty of any other crime committed by a principal which is a natural and probable consequence of the crime originally aided and abetted." Appellant claims this first paragraph was read to the jury. We note the rest of the printed instruction, defining the natural and probable consequences doctrine and identifying the target and nontarget offenses, is stricken out by interlineation. The final paragraph is also highlighted at the margin but is clearly stricken by interlineation. It states: "Whether a consequence is 'natural and probable' is an objective test based not on what the defendant actually intended but what a person of reasonable and ordinary prudence would have

---

[18] As noted above, the People requested this court take judicial notice of our records and nonpublished opinion in appellant's direct appeal that affirmed his conviction and sentence. We granted appellant leave to file an informal response to the request, stated that failure to file a response may be deemed agreement that the request should be granted, and deferred ruling on the request until consideration of the appeal on the merits. We filed this order prior to the date that appellant's reply brief was due. Appellant did not file a response or opposition to the People's request for judicial notice, and we have granted that request.

Appellant's assertions that some version of CALJIC No 3.02 was given to the jury are in his reply brief, but do not include citations to either the clerk's or reporter's transcript from the trial.

expected would be likely to occur.  The issue is to be decided in light of all of the circumstances surrounding the incident.  A natural consequence is one which is within the normal range of outcomes that may be reasonably expected to occur if nothing unusual has intervened.  Probable means likely to happen."

Our review of the reporter's transcript does not show that any part of CALJIC No. 3.02 was given to the jury, including the portion quoted by appellant.  Instead, the reporter's transcript contains an exchange between the court and defense counsel at the instructional conference, where counsel stated CALJIC No. 3.02 was requested by the defense and then withdrawn.  In addition, this court's opinion in the direct appeal lists the instructions given for aiding and abetting and accomplices and does not include CALJIC No. 3.02.  (*People v. Alardin*, *supra*, F039369, at pp. 64–65, 67.)

### E.     *The Murder Instructions*

We next review the murder instructions to determine if appellant was convicted under a theory that is still applicable after the statutory amendments.

First, the court instructed the jury that appellant was charged with the crime of murder, that "[e]very person who unlawfully kills a person with malice aforethought *or during the commission of assault with a firearm, a felony inherently dangerous to human life*, is guilty of the crime of murder."  (Italics added.)  "In order to prove this crime, each of the following elements must be proved:  [¶]  One, a human being a killed; [¶]  Two, the killing was unlawful; And three, the killing was done with malice aforethought *or occurred during the commission of a felony inherently dangerous to human life.  Assault with a firearm is a felony inherently dangerous to human life*."  (Italics added.)  As will be explained, a later instruction clarified that assault with a firearm only applied to second degree murder.

The court next gave the definitions for express and implied malice:  "Malice is express when there is manifested an intention unlawfully to kill a human being.  [¶] Malice is implied when:  [¶]  One, the killing resulted from an intentional act; [¶] Two,

63.

the natural consequences of the act are dangerous to human life; [¶] And, three, the act was deliberately performed with knowledge of the danger to and with conscious disregard for human life."[19]

CALJIC No. 8.20 defined premeditation for first degree murder, and that express malice was required.

> "All murder which is perpetrated by any kind of willful, deliberate and premeditated killing *with express malice aforethought* is murder of the first degree. [¶] The word willful as used in this instruction means intentional. The word deliberate as used in this instruction means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. [¶] The word premeditated means considered beforehand [¶] If you find that the killing was preceded by and accompanied by a clear, deliberate intent on the part of the defendant to kill, which was the result of deliberation and premeditation, so that it must have been formed upon preexisting reflection and not under a sudden heat of passion or other condition precluding the idea of deliberation, it is murder of the first degree…." (Italics added.)

The court next instructed the jury about second degree murder, and that there were two different ways to reach a conviction for second degree murder. First, second degree murder was an unlawful killing with malice aforethought "but the evidence is insufficient to prove deliberation and premeditation." Second, "[m]urder of the second degree is also the unlawful killing of a human being when: [¶] One, the killing resulting from an intentional act; [¶] *Two, the natural consequences of the act are dangerous to human life*; [¶] And, three, the act was deliberately performed with knowledge of the danger to *and with conscious disregard for human life*. [¶] When the killing is a direct result of

---

**[19]** Senate Bill 1437 eliminated natural and probable consequences liability for second degree murder based on *imputed* malice, but implied malice is a distinct concept and remains a valid theory of second degree murder. (*Gentile, supra*, 10 Cal.5th at p. 850; *People v. Rivera* (2021) 62 Cal.App.5th 217, 232, overruled to the extent that it is not inconsistent with *Lewis, supra*, 11 Cal.5th 952; *People v. Cortes* (2022) 75 Cal.App.5th 198, 201–202; *People v. Soto, supra*, 51 Cal.App.5th at pp. 1056–1057; *People v. Roldan, supra,* 56 Cal.App.5th at pp. 1004–1005.)

such an act, it is not necessary to prove that the defendant intended that the act would result in the death of a human being." (Italics added.)

After stating this definition, the next instruction clarified that the prior reference to assault with a firearm was limited to second degree murder:

> "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs *during the commission of an assault with a firearm is murder of the second [degree if]* the perpetrator had the specific intent to commit that crime."

The court defined the elements of assault with a firearm, that a person was assaulted; an assault occurred if a person willfully committed an act which, by its nature, would probably and directly result in the application of force on another person; the person had the present ability to apply physical force to another person; and the assault was committed with a firearm, that included a shotgun.

The court instructed that if the jury convicted appellant of murder, it had to state in the verdict whether the murder was of the first or second degree; and if the jury was convinced beyond a reasonable doubt and unanimously agreed that appellant committed a murder but there was a reasonable doubt whether the murder was of the first or second degree, the jury had to give appellant "the benefit of that doubt and return a verdict fixing the murder as of the second degree."

Finally, the court instructed on the lesser included offense of involuntary manslaughter as an unlawful killing that occurred during the commission of an unlawful act "not amounting to a felony" which is dangerous to human life under the circumstances of its commission; the instruction identified the underlying offense as misdemeanor brandishing a firearm and defined the elements of that misdemeanor offense.

**F.**     *Analysis*

Appellant argues that it cannot be determined from the limited record whether the jury convicted appellant of first degree murder as the actual killer, particularly since the

jury could not make a finding on the personal discharge enhancement.  The People assert the instructions show that the only way appellant could have been convicted of first degree murder was if the jury found he killed a person with express malice aforethought and willful, deliberate premeditation.

In reviewing the jury instructions given at appellant's trial, we are guided by the well-established rules that the correctness of those instructions " 'is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' [Citation.] ' "The absence of an essential element in one instruction may be supplied by another or cured in light of the instructions as a whole." ' " (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016.)  We look to the instructions as a whole and consider the entirety of the record, including the arguments of counsel.  (*People v. Mason* (2013) 218 Cal.App.4th 818, 825.)  We presume the jury is capable of understanding and correlating the court's instructions.  (*People v. Scott* (2015) 61 Cal.4th 363, 399; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

The jury is presumed to disregard an " 'abstract' " instruction, i.e., 'one which is correct in law but irrelevant[.]' " (*People v. Rowland* (1992) 4 Cal.4th 238, 282; *People v. Olguin* (1994) 31 Cal.App.4th 1355, 1381.)  " 'A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant.' " (*People v. Solomon* (2010) 49 Cal.4th 792, 822.)

As explained above, since the jury could not reach a finding on the personal discharge enhancement, it cannot be determined from the instructions and verdicts whether appellant was convicted as the actual killer.  We agree with the People, however, that the record of conviction, consisting of the instructions and the verdict, establish he was convicted as a direct aider and abettor, and not on an indirect theory based on an imputed malice and the natural and probable consequences doctrine.

The jury was instructed on direct aiding and abetting, a theory that remains valid after the amendments enacted by Senate Bills 1437 and 775 – that a person aids and abets when, "with knowledge of the unlawful purpose of the perpetrator, and … with the intent or purpose of committing or encouraging or facilitating the commission of the crime, … by act or advice aids, promotes, encourages, or instigates the commission of the crime," and that the aider and abettor must "share the criminal intent with which the crime was committed." The entirety of the instructions for murder, premeditation, and malice establishes the jury could only convict appellant of first degree premeditated murder if it found he committed a murder "perpetrated by any kind of willful, deliberate and premeditated killing with *express malice aforethought*." (Italics added.)

### 1. Felony Murder

The People acknowledge the definitional instruction for murder included language about the felony-murder rule but argue the jury did not rely on this instruction to convict him of murder, since the prosecutor said in closing argument that it would receive a felony-murder instruction but clarified to the jury that he was not relying on a felony-murder theory.

Regardless of the prosecutor's attempted election, the jury was instructed that the elements of murder were that a person was killed, the killing was unlawful, and "the killing was done with malice aforethought *or occurred during the commission of a felony inherently dangerous to human life. Assault with a firearm is a felony inherently dangerous to human life.*" (Italics added.)

The entirety of the instructions refute any possibility the jury convicted appellant based on a felony murder theory because another instruction clarified felony murder and assault with a firearm only applied to second degree murder – that appellant could be convicted of second degree murder if the killing resulted from an intentional act, the natural consequences of that act were dangerous to human life, the act was deliberately performed with knowledge of the danger to and with conscious disregard for human life,

67.

and an unlawful killing "whether intentional, unintentional or accidental, which occurs *during the commission of an assault with a firearm is murder of the second [degree if]* the perpetrator had the specific intent to commit that crime." (Italics added.) The jury was thus instructed that it could only rely on assault with a firearm to convict appellant of second degree murder, a verdict that was not returned in this case.

## 2. Natural and Probable Consequences

Appellant asserts the record establishes a prima facie case for relief because the jury was instructed on the natural and probable consequences doctrine.[20] The People agree the special instruction on aiding and abetting stated the natural and probable consequences doctrine but argue the jury did not convict appellant based on imputed malice because there were no instructions on target and nontarget offenses that could have resulted in appellant's conviction for first degree murder.

As discussed above, after instructing on direct aiding and abetting, the court also gave the special instruction that stated the natural and probable consequences doctrine, that "the aider and abettor in the proper case is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, *but he is also liable for the reasonable and natural or probable consequences of any act that he knowingly aided and encouraged. Whether the act committed was the natural and probable consequence of the act encouraged and the extent of defendant's knowledge are questions of fact for the jury.*" (Italics added.)

---

**20** As explained above, appellant agrees with the People that the court gave a special instruction that defined the natural and probable consequences doctrine. However, appellant further claims the court gave a partial version of CALJIC No. 3.02, that also defined natural and probable consequences but omitted definitions of target and nontarget offense. The record from appellant's trial shows that CALJIC No. 3.02 was requested and then withdrawn by the defense, and the court did not instruct the jury on any language from CALJIC No. 3.02.

However, the jury was not instructed about any target or nontarget offenses that could have resulted in appellant's conviction for first degree premeditated murder being based on indirect aiding and abetting, the natural and probable consequences doctrine, or a theory of imputed malice. While the jury was instructed about other offenses in addition to the charged crime of murder, the entirely of the instructions prohibited the jury from relying on any of the other offenses to convict appellant of first degree premeditated murder.

First, as to the charged offense of murder, the jury was instructed with the definitions of first and second degree murder, and that it had to state in the verdict form whether the murder was for first or second degree. Next, the jury was instructed on the elements of assault with a firearm, but as already explained, it was also instructed that offense was only applicable to second degree murder based on a felony-murder theory. Finally, the jury was instructed on involuntary manslaughter as the lesser included offense and the elements of misdemeanor brandishing a firearm, but those instructions limited the jury's consideration of brandishing to involuntary manslaughter.

We thus conclude the instructions did not permit the jury to convict appellant of first degree premeditated murder based on the commission of assault with a firearm, misdemeanor brandishing, or any other target/nontarget offenses that would have implicated imputed malice. The instructions only permitted the jury to convict appellant of first degree premeditated murder based on express malice and his intent to kill, and the aiding and abetting instructions were limited to the direct theory and did not permit a first degree murder conviction under an the indirect theory of imputed malice. We presume the jury followed the court's instructions in reaching its verdict. While the instructional language about natural and probable consequences was partially correct in law, it was irrelevant to the jury's verdict of first degree premeditated murder and it "must have been understood, and dismissed, by the jury as mere surplusage" that was "too insignificant to have affected the outcome within a 'reasonable probabilit[y]' " under *Watson*. (*People v.*

69.

*Prettyman* (1996) 14 Cal.4th 248, 280, (conc. opn. of Mosk, J.); *People v. Rowland, supra*, 4 Cal.4th at p. 282.)

### 3. "Equally Guilty"

Appellant contends the inclusion of the phrase "equally guilty" in CALJIC No. 3.00 impermissibly permitted the jury to convict him of first degree murder based on the principal's intent, without finding that appellant personally had the intent to kill.

As given in this case, CALJIC No. 3.00 stated: "Persons who are involved in committing a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation, *is equally guilty*. Principals include, one, those who directly and actively commit the act constituting the crime, or, number two, those who aid and abet the commission of a crime." (Italics added.)

The instruction that was given to the jury "generally stated a correct rule of law. All principals, including aiders and abettors, are 'equally guilty' in the sense that they are all criminally liable. [Citation.]" (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 433.) However, the "equally guilty" language has been held misleading "if the principals in a particular case might be guilty of different crimes and the jury interprets the instruction to preclude such a finding," and the pattern instruction has since been amended. (*Ibid.*; see, e.g., *People v. Nero* (2010) 181 Cal.App.4th 504, 517–520.)

In this case, the possibility that the jury may have relied on an imputed malice theory based on the "equally guilty" phrase is foreclosed by the entirety of the instructions, particularly CALJIC No. 3.01, that that an aider and abettor had to know the unlawful purpose of the perpetrator, intend to commit, encourage, or facilitate the commission of the crime, and by act or advice, aided or encouraged the commission of the crime. There is no reasonable likelihood the jurors would have understood the "equally guilty" language to allow them to base appellant's liability for first degree murder on the mental state of the actual shooter, rather than on his own mental state as a

direct aider and abettor of first degree premeditated murder. (See, e.g., *People v. Johnson* (2016) 62 Cal.4th 600, 641.)

**G.** *Conclusion*

The superior court improperly denied appellant's petition without appointing counsel, requesting briefing, or conducting a hearing, and improperly made factual findings that appellant was the actual killer. These statutory errors, however, are not prejudicial under *Watson* because the jury instructions and verdict establish that appellant was convicted of first degree premeditated murder based on direct aiding and abetting, and was ineligible for relief as a matter of law.

## DISPOSITION

The People's unopposed request for judicial notice of the record and nonpublished opinion in *People v. Alardin*, *supra*, F039369 is granted.

The superior court's order on or about April 9, 2021, denying appellant's section 1172.6 petition is affirmed.